In re TAK COMMUNICATIONS,
INC., Debtor.

NEW BANK OF NEW ENGLAND, N.A.,
individually and as agent for Chemical
Bank, the New Connecticut Bank and
Trust Company, N.A., Heller Financial
Inc., the Bank of Nova Scotia, Ameri-
trust Company, National Association
and Norwest Bank Minnesota, National
Association, Plaintiffs–Appellants,

v.

TAK COMMUNICATIONS, INC. and
the Official Committee of Unsecured
Creditors, Defendants–Appellees.

No. 91–C–935–C.

United States District Court,
W.D. Wisconsin.

March 23, 1992.

As Corrected April 9, 1992.

Roy L. Prange, Jr., Quarles & Brady, Madison, Wis., for New Bank of New England, N.A., Chemical Bank, The New Connecticut Bank & Trust, Heller Financial, Inc., The Bank of Nova Scotia, Ameritrust Co., Norwest Bank Minnesota, Nat. Ass'n.

Brady C. Williamson, Lafollette & Sinykin, Madison, Wis., for Tak Communications, Inc. and Official Committee of Unsecured Creditors.

Thomas M. Pyper, Madison, Wis., for intervenor Heller Financial, Inc.

David Walsh, Foley & Lardner, Madison, Wis., for Unsecured Creditors.

## OPINION AND ORDER

CRABB, Chief Judge.

This is an appeal and cross-appeal from an order issued by the United States Bankruptcy Court for the Western District of Wisconsin granting summary judgment to defendant Tak Communications and denying Tak Communications' motion to strike the affidavits submitted by plaintiff New Bank of New England on its own behalf and on behalf of the other plaintiff-banks. The appeals arise from an adversarial proceeding in bankruptcy court to determine the validity of plaintiffs' liens on certain broadcasting licenses held by Tak Communications. The bankruptcy judge held that the policy of the Federal Communications Commission prohibited plaintiffs from having perfected security interests in the broadcasting licenses. Additionally, the bankruptcy judge denied Tak Communications' motion to strike certain affidavits submitted by plaintiffs on the ground that the affidavits were irrelevant to a determination whether plaintiffs had a security interest in Tak Communications' broadcasting licenses.

Plaintiff New Bank of New England, individually and on behalf of the other banks named as plaintiffs, appeals the order granting summary judgment to Tak Communications on three grounds: 1) that state law permits security interests in broadcast licenses; 2) that the FCC does not preempt state law in this area; and 3) that the FCC does not forbid limited security interests in broadcast licenses. Tak Communications and the unsecured creditors take the position that the FCC has a long-standing policy forbidding security interests in broadcast licenses that preempts any state law to the contrary.

I conclude that the FCC does have a policy prohibiting security interests in broadcasting licenses that preempts state law to the contrary. Therefore, the order granting summary judgment to Tak Communications will be affirmed.

With regard to the affidavits that Tak Communications seeks to strike, I agree with the bankruptcy judge that the affidavits are irrelevant to the determination whether plaintiff has a security interest in broadcast licenses, and therefore Tak Communications' motion to strike them will be denied. If the affidavits become relevant at some future point, Tak Communications is free to renew its objection.

For the purposes of this motion only, I find from the record that the following facts are undisputed.

### FACTS

Tak Communications, Inc., operates several radio and television stations under licenses and authorizations granted by the Federal Communications Commission. Tak Communications is owned and operated by its president and chief executive officer, Sharad Tak. On September 20, 1988, Tak Communications, Inc., and Tak–WGRC (collectively referred to as Tak) entered into a Revolving Credit Agreement and Security Agreement with the Bank of New England (predecessor to plaintiff New Bank of New England), which acted individually and as the agent for several other banks. At the time the agreements were executed, Tak owned and operated several radio and television broadcasting stations. Under the agreements, the banks gave Tak a $175 million line of credit.

In return, Tak gave the banks an interest in nearly every aspect of its operations. Section 1.8 of the Revolving Credit Agreement gave the banks a security interest in Tak's tangible and intangible property; a first mortgage on any of Tak's real estate; first priority collateral assignments of Tak's mortgages or leasehold interests; a pledge of Tak's capital stock; a collateral assignment of the life insurance policy of Sharad Tak; guaranties from Tak's subsidiaries; and a makewell agreement from Sharad Tak. Section 1(b) of the Security Agreement gave the banks a security interest in Tak's broadcasting licenses. Specifically, the section provides that the banks have

to the extent that such rights are assignable, the Company's [Tak's] rights under all present and future authorizations, permits, licenses and franchises issued, granted or licensed to the Company for the construction, installation or operation of television or radio broadcast stations ...

Section 14 of the Security Agreement prohibits the parties from transferring control of any licenses issued by the FCC

if such assignment ... would require under then existing law (including the written rules and regulations promulgated by the FCC), the prior approval of the FCC without first obtaining such approval of the FCC.

Section 14 also requires Tak to cooperate with the banks in order to secure the banks' rights under the agreements, including filing applications for a transfer of licenses with the FCC and obtaining FCC approval for any transaction under the agreement. In the event of Tak's default, the Security Agreement gives the banks the right to take possession of the collateral, "subject to the provisions of the Uniform Commercial Code or other applicable law, including the rules and regulations of the Federal Communications Commission." Following the execution of the Revolving Credit Agreement and Security Agreement, the banks filed Uniform Commercial Code financing statements in Wisconsin and Virginia listing the banks' security interest in the FCC licenses.

On January 3, 1991, Tak filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code. Currently, Tak is operating its business as a debtor-in-possession without the appointment of a trustee. Tak owes the banks nearly $169 million in principal and over $9 million in interest on the revolving credit notes.

On February 21, 1991, the law firm of Hogan & Hartson petitioned the FCC to issue a declaratory ruling that limited security interests in FCC licenses are permitted. Plaintiff New Bank of New England and several other banks represented in this appeal filed comments in support of the declaratory ruling. On April 10, 1991, plaintiff New Bank of New England, individually and as agent for the other plaintiff-banks, initiated an adversary proceeding in the bankruptcy court seeking to declare the validity of their liens on Tak's rights under the FCC licenses.[1] Both sides

---

**1.** By the time the adversarial action was initiated, the identities of the banks had changed.

The Bank of New England and the Connecticut Bank and Trust Company, both original parties

moved for summary judgment. The banks sought a declaratory judgment that their security interests in Tak's rights under the FCC licenses and in Tak's right to sell the station as a going concern were a perfected lien. Tak sought summary judgment that the banks' purported security interests in the FCC licenses were prohibited by law.

Following a hearing on September 24, 1991, the bankruptcy judge issued a ruling from the bench granting summary judgment to Tak on the ground that the FCC prohibited security interests in broadcast licenses. An order reflecting that ruling was entered on October 11, 1991.

## OPINION

■ To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The parties do not dispute any material facts; they dispute a question of law: whether security interests in broadcasting licenses are permitted by law. Because this is a question of law, review of the bankruptcy judge's conclusion is *de novo. In re Scarlata,* 127 B.R. 1004, 1008 (N.D.Ill.1991) (citing *In re Excalibur Auto. Corp.,* 859 F.2d 454, 457 n. 3 (7th Cir. 1988)).

### FCC Policy Regarding Security Interests in the Broadcast Licenses

The purpose of the Communications Act is to ensure that the federal government "maintain[s], through appropriate administrative control, a grip on the dynamic aspects of radio transmission." *Federal Communications Comm'n v. Midwest Video Corp.,* 440 U.S. 689, 696, 99 S.Ct. 1435, 1439, 59 L.Ed.2d 692 (1979). Consistently with that end, federal law allows for the use and not "ownership" of the channels of radio transmission. 47 U.S.C. § 301 prohibits the ownership of licenses granted by the FCC; sections 304 and 309(h) prohibit the vesting of interests in operating a station or in using a transmission frequency beyond the terms of the license. Additionally, 47 U.S.C. § 310(d) prohibits the assignment and transfer of a station license without application to the FCC and the FCC's consent.[2] 47 C.F.R. § 73.1150 prohibits the transferor of a license from retaining any reversionary interest in the license.

■ Although a licensee cannot "own" a broadcast license, 47 U.S.C. § 301, the license still has considerable value to the licensee because it can be transferred to a third party, subject to the FCC's approval. In other words, the holder of a broadcasting license may sell its hard assets and transfer its license to a third party by filing an application with the FCC to transfer the license and obtaining FCC approval. This permits a licensee to obtain market value for the station as a going concern (physical assets and license). However, the parties to the transaction run the risk that the FCC will not approve of the transfer.

The banks concede that the Communications Act prohibits ownership interests in Tak's licenses and prohibits the banks from operating the station or succeeding to Tak's licenses without the FCC's prior approval. However, they argue that the Communications Act and the FCC rules and regulations do not prohibit them from obtaining Tak's limited rights under the

---

to the revolving credit and security agreements, had been closed by the Federal Deposit Insurance Corporation, and their rights under the agreements had been transferred to the New Bank of New England and the New Connecticut Bank and Trust Company, national banking associations that are owned by the Federal Deposit Insurance Corporation. Additionally, Heller Financial, Inc., and the Ameritrust Company National Association, had received partial assignments of the revolving credit notes.

**2.** 47 U.S.C. § 310(d) states in relevant part:

No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby.

licenses, such as the right to sell the station as a going concern. Additionally, the banks argue that they may assert a priority lien against the proceeds from the sale of Tak's assets as a going concern or the recapitalization of Tak under a plan of reorganization. By doing this, the banks would receive not only the value of the tangible assets, but also the considerable value that represents the broadcasting licenses. The banks argue that "[w]hat is at stake here is the right of a broadcaster, ... to grant a lender or group of lenders, ... priority over other creditors in the full going-concern value of its business, a right which a borrower in another line of business would clearly possess." Plaintiffs–Appellants' Br. at 5.

■ The Seventh Circuit Court of Appeals has not ruled on the question whether the FCC permits security interests in broadcast licenses, but at least one other court of appeals has held that such interests are prohibited. In *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986), the court held that federal law precluded the former owner of a radio station from obtaining a security interest in the station's FCC licenses. The owner had sold its radio station assets and transferred its broadcasting licenses to a corporation in return for a purchase money mortgage. Following the transaction, the new owner defaulted on its payments and filed for Chapter 11 bankruptcy. *Id.* at 387. In the bankruptcy proceedings, the former owner sought to stop the sale of the station to a third party, claiming that its mortgage was a lien on both the tangible assets and the FCC licenses, and offering to buy back the station for an amount set off by its mortgage lien. The bankruptcy court rejected the former owner's offer, concluding that the former owner was barred from obtaining a security interest in the FCC licenses. *Id.* at 390.

The Sixth Circuit Court of Appeals agreed with the bankruptcy court, holding that

> the Bankruptcy Court did not err in concluding that SI's [the former owner's] mortgage did not include the FCC licens-

es. In *In re Merkley*, 94 F.C.C.2d 829, 54 Rad.Reg.2d 68, 70 (1983) (citations omitted), the Federal Communications Commission ("FCC") stated: "The Commission has consistently held that a broadcast license, as distinguished from the station's plant or physical assets, is not an owned asset or vested property interest so as to be subject to a mortgage, lien, pledge, attachment, seizure, or similar property right." *See also In re Radio KDAN, Inc.*, 11 F.C.C.2d 934, 12 Rad.Reg.2d 584, *reconsideration denied*, 12 F.C.C.2d 1026, 13 Rad.Reg.2d 100 (1968), *affirmed on other grounds sub nom. W.H. Hansen v. Federal Communications Commission*, 413 F.2d 374 (D.C.1969).

*Id.* at 390.

At least three other courts have adopted the *Stephens Industries* holding, including the Bankruptcy Court for the Western District of Wisconsin in this case. In *In re Smith*, 94 B.R. 220, 221 (Bankr.M.D.Ga. 1988), the bankruptcy court concluded that "the position of the FCC is quite clear ..." that there can be no security interest in an FCC license (citing *Stephens Industries*, 789 F.2d 386; *In re Merkley*, 94 F.C.C.2d 829 (1983)). In *Continental Bank v. Everett*, 760 F.Supp. 713 (N.D.Ill.1991), the district court granted summary judgment to a lender who had failed to disclose to guarantors that security interests in broadcasting licenses were unobtainable. The court held that although there was evidence that the lender knew it could not perfect an interest in the licenses, it could not be held liable for failing to disclose its knowledge because the information was obtainable from other sources. *Id.* at 717–18.

The banks have cited only one case in which a court has allowed a creditor to take a priority interest in a broadcasting license, and in that case the court did not explain the basis for its decision. *See In re Ridgely Communications, Inc.*, 1991 Bankr. LEXIS 1921 (Nov. 20, 1991) (unpublished) (creditor entitled to proceeds from sale of radio stations, "including the portion of the proceeds attributable to the Debtor's right and interest in such broadcast licenses").

The banks argue that *Stephens Industries* is not binding and was decided wrongly because the FCC cases upon which the court of appeals relied do not support the conclusion that there is an FCC policy prohibiting all security interests in licenses. The banks argue that the bankruptcy judge relied incorrectly on dicta in *Stephens Industries* that was itself based erroneously on mere dicta in the FCC cases. An analysis of relevant FCC materials reveals otherwise.

In *In re Merkley*, 94 F.C.C.2d 829 (*Merkley I*), *recon. denied*, 56 R.R.2d 413 (1984), *aff'd sub nom. Merkley v. FCC*, 776 F.2d 365 (D.C.Cir.1985), a court-appointed receiver filed an application with the FCC for the involuntary assignment of a broadcast license. A district court had appointed the receiver to file the application after the court found that the buyer of the license had defaulted on its contractual duties to the seller and that, under the contract, the buyer had forfeited its interests in the FCC license. The contract at issue provided that upon the buyer's default, the seller had the right "to re-enter and take possession of said premises without legal processes." *Merkley I*, 94 F.C.C.2d at 831.[3]

Before determining whether to grant the involuntary assignment, the Commission set forth the relevant principles:

> The Commission has consistently held that a broadcast license, as distinguished from the station's plant or physical assets, is not an owned asset or vested property interest so as to be subject to a mortgage, lien, pledge, attachment, seizure, or similar property right. *See* Sections 301, 304, 309(h), 310(d), of the Communications Act, as amended, and Section 73.1150 of the Commission's Rules. *See also Radio KDAN, Inc.*, 11 FCC2d 934, *recon. denied* 13 RR2d 100 (1968) *affirmed on procedural grounds sub nom. W.H. Hansen v. FCC*, 413 F.2d 374

(D.C.Cir.1969). As stated in *Radio KDAN*, "This principle is firmly rooted in Commission practice, its rationale being that such hypothecation endangers the independence of the licensee who is and who should be at all times responsible for and accountable to the Commission in the exercise of the broadcasting trust." 13 RR2d at 102.

*Merkley I*, 94 F.C.C.2d at 830–31.

After setting forth the relevant principles, the FCC denied the receiver's application for involuntary transfer of the license despite the state court's ruling that the buyer had forfeited its rights in the license. Acknowledging that the courts had the expertise and jurisdiction to resolve contractual disputes, the Commission explained that the licensee's contract was subject to the Commission's rule against reversionary interests. *Id.* at 839; 47 C.F.R. § 73.1150. The Commission found that the contractual provision contradicted FCC policy primarily because it "treated the broadcast license as the property of the former licensee ...," allowing the former licensee to repossess the license. *Id.* at 839 n. 10. Additionally, the Commission found that the contractual provision allowed the former licensee to gain control of the license without seeking the Commission's approval. *Id.*

Upon reconsideration of its decision in *Merkley*, the Commission denied the receiver's application for an involuntary transfer of the license again. *In re Merkley*, 56 R.R.2d 413 (1984) (*Merkley II*). By this time, the receiver had taken back the physical assets of the station and sought to take back only the license itself. *Id.* at 417. In refusing the receiver's application, the Commission stated that the current station operator was not under any legal financial disability that would prevent it from operating the station. *Id.* at 416. The Commission added that

---

**3.** In a prior proceeding in which the seller sought an assignment of the license to the buyer, the FCC approved the assignment on the condition that "this provision was amended to eliminate the Seller's right to 're-enter and take possession of said premises without legal processes,' i.e., a right of reversion to the station

and its license and to provide, as an alternative remedy in the event of a default, a 'bona fide public sale' subject to prior Commission approval." For some unexplained reason, the original, unmodified contract was submitted to the district court, despite the fact that the Commission had rejected this clause.

a Commission license is not an owned asset or property right. [citation omitted]. A security interest in the assets of the broadcast station does not effect a transfer or assignment of the broadcast license. *Holden v. Sanders*, 33 RR2d 700 (1975). Further, creditors must not equate the license with buildings and the equipment to which the licensee has acquired title. Credit cannot be extended in reliance upon the license as an asset from which the licensee's obligations may be satisfied. *Twelve Seventy, Inc.*, 6 RR2d 301, 304 (1965).

*Id.*

The banks launch several unpersuasive attacks on both *Merkley* decisions. First, they argue that the Commission was not clear about its reasons for denying the application for involuntary transfer, as shown by its decision in *In re Arecibo Radio Corp.*, 101 F.C.C.2d 545 (1985), which modified *Merkley II.* In *Arecibo* the Commission found that the state court had the authority to order the current licensees to execute an application for assignment because that order did not infringe on the Commission's exclusive jurisdiction over licensing matters. *Id.* at 549. The Commission then approved the application for transfer in accordance with its general rule that a license and a station's assets must be kept together. *Id.* at 550. The Commission distinguished *Arecibo* from *Merkley I* and *Merkley II:* An exception to the general rule was warranted in the *Merkley* cases because it was in the public interest to allow the current licensee to continue providing service to the public. *Id.* at 550 n. 12. The Commission stated

[t]o the extent *Merkley II* suggests that the licensee must be adjudged legally disabled before the Commission will assign a license involuntarily, *see* 56 R.R.2d at 417, it does not accurately characterize our policy in this area. Our policy is to accommodate state and local court decrees adjudicating disputes over contract and property rights, unless a public interest determination under the Communications Act, such as the determination in *Merkley*, compels a different result.

*Id.*

It is clear that *Arecibo* did not modify any of the language in *Merkley I* and *Merkley II* regarding the FCC's stand against security interests in broadcasting licenses. *Arecibo* did not address that issue at all. Further, I do not accept the banks' attempt to characterize as dicta the language in *Merkley I* prohibiting a "mortgage, lien, pledge, attachment, seizure, or similar property right" on FCC licenses. Together with the language against reversionary interests, that language provided the basis for the Commission's decision in *Merkley I.*

The banks argue that *Merkley I* actually supports their position because it approves a bona fide public sale as an alternative to taking possession of a station in response to a buyer's default. *See supra* n. 3. However, a contractual right to a public sale of a station and a right to compel a party to file an application with the FCC are different from a contractual right to treat an FCC license as collateral. By itself, a public sale does not grant a lender a security interest in the license, although it may allow the lender to protect its investment by ensuring that the station is sold as a going concern to a third party that can operate the station successfully. Similarly, a contractual right to compel a party to apply to the Commission for a transfer of the license protects the lenders because it makes it possible for the station to be sold as a going concern. The banks are not seeking to enforce either of those contractual rights; they are seeking to enforce their contractual right to a security interest in Tak's licenses.

The banks attempt to diminish the *Merkley* cases by asserting that the cases upon which the *Merkley* cases relied do not support the conclusion that security interests in licenses are prohibited. However, an analysis of those cases reveals direct support for the Commission's statements in *Merkley I* and *Merkley II.*

In *In re Twelve Seventy, Inc.*, 6 R.R.2d 301 (1965), the Commission declined to re-

new a license without a hearing on the licensee's qualifications despite the fact that the licensee was in bankruptcy and the trustee in bankruptcy needed the license in order to sell the station as a going concern. The trustee argued that the license should be renewed and transferred to him in order to protect innocent creditors. The Commission held that the license could not be renewed if the current licensee failed to meet FCC qualifications, regardless of the subsequent hardship for creditors. The Commission stated

> [t]he Trustee's contention that creditors are entitled to look to the sale of the broadcast facility as a going business fails to take into account the character of the interest acquired by a licensee....
>
> \*    \*    \*    \*    \*    \*
>
> Manifestly, therefore, a broadcast authorization confers upon the holder only a privilege subject to very definite conditions and limitations, and the license may not be equated with the buildings and equipment to which the licensee has acquired title. The creditor stands in no better position than the broadcaster. Credit cannot be extended in reliance upon the license as an asset from which the licensee's obligations may be satisfied, and the creditor must assume the risk that for good cause shown a license may be revoked, or that a renewal thereof may be denied or an authorization for assignment refused as inconsistent with the public interest.

*Twelve Seventy,* 6 R.R.2d at 304.

The banks argue that *Twelve Seventy* stands only for the proposition that creditors' interests are subordinate to the Commission's authority to grant or deny licenses. Under this narrow interpretation, the banks assert that they may have a perfected security interest in the license, subject to the FCC's approval of any assignment. Their narrow reading of *Twelve Seventy* is strained. Logically, the case stands for the proposition that a license will not be renewed to protect creditors *and* for the proposition that a creditor cannot rely on a license to satisfy its lien or security interest.

In *In re Radio KDAN, Inc.,* 11 F.C.C.2d 934 (1968), *recon. denied,* 13 R.R.2d 100 (1968), *aff'd, W.H. Hansen v. FCC,* 413 F.2d 374 (D.C.Cir.1969), a seller of a station foreclosed on the personal and real property of the station and then sought to have the license transferred back to it after the buyer's default. When the buyer refused to sign an application for assignment of the license, the seller argued that the purchaser's signature was not required because the mortgage document gave the seller a mortgage on the license itself, with the right to act as the purchaser's attorney-in-fact and to execute an assignment application in the event of the purchaser's default. *Id.* at 934 n. 1. The Commission did not have to address whether the seller's mortgage on the license was valid. It found that no transfer could occur because the current licensee had forfeited the license by allowing the station to go silent. *Id.* at 934 n. 1. However, the Commission did state that the mortgage clause granting the seller the right to act as the purchaser's attorney in fact upon default was

> void ab initio since it attempts to retain for Hansen a reversionary interest in the KDAN license, and as such is expressly forbidden by sec. 73.139 of our rules. The extraordinary notion that a station license issued by this Commission is a mortgageable chattel in the ordinary commercial sense is untenable.

*Id.*

Upon a motion for reconsideration, the Commission stated again that the seller could not retain a reversionary interest in the license through a mortgage provision that allowed the seller to seek reassignment of the license without the buyer's signature. *In re Radio KDAN, Inc.,* 13 R.R.2d 100 (1968) (*Radio KDAN II* ). The Commission stated that

> a broadcast license (as distinguished from a station's plant or physical assets) may not be hypothecated by way of mortgage, lien, pledge, lease, etc. This principle, deriving ultimately from Section 301 of the Communications Act, is firmly rooted in Commission practice, its rationale being that such a hypothecation

endangers the independence of the licensee who is and who should be at all times responsible for and accountable to the Commission in the exercise of the broadcasting trust. If this rider has [sic] been submitted to the Commission as required by our rule at the time of its origin, it would have been rejected for two vital defects: (1) it purported to mortgage the KDAN license; (2) and it reserved to Hansen a reversionary interest in the KDAN license.

*Id.* at 102.

The banks try to distinguish their situation from *Radio KDAN* and *Radio KDAN II* by attributing those decisions to the rule against reversionary interests. However, it is clear from the language in *Radio KDAN II* that the Commission's decision rested on two alternative grounds: the seller's attempt to retain a reversionary interest in the license, and the seller's attempt to mortgage the license. *Id.*

The Commission has recognized that its policy prohibiting security interests in licenses has an adverse effect upon both the creditor and the licensee. In *In the Matter of Commission Policy Regarding the Advancement of Minority Ownership in Broadcasting*, 99 F.C.C.2d 1249 (1985), the Commission acknowledged that its policy prohibiting reversionary interests in licenses puts a seller-creditor at a greater risk because it does not permit "collateralization of the *actual* value of the station, *i.e.*, the physical assets plus the goodwill/going concern value...." *Id.* at 1251. However, the Commission declined to change its position prohibiting automatic reversionary interests in broadcasting licenses, stating that "a broadcast license ... has not been subject to a reversionary interest, mortgage, lien, pledge, or any other form of security interest." *Id.* at 1253. The Commission noted that other methods existed to protect seller-creditors, short of obtaining a security interest in the license, *i.e.*, obtaining a pledge of the station's stock. *Id.* at 1254. Although the Commission did not discuss whether third party financiers could obtain a security interest in the license, that conclusion follows logically from its discussion regarding reversionary interests. *See id.* at 1252 (submitted comment that "the scope of the rule making should be expanded to include third party financing in addition to seller-financing, to better enable minority broadcasters to obtain bank loans").

The banks rely heavily on *In re Bill Welch*, 65 R.R.2d 755 (1988), to support their argument that there is no FCC policy against security interests in licenses. In *Welch* the Commission reexamined its interpretation of §§ 301, 304, and 310(d) of the Communications Act and reversed its policy prohibiting the private sale by a licensee of "bare" authorizations for unbuilt facilities in cellular service. *Id.* at 758–59. This reversal permitted licensees to treat the authorizations like "property" in the sense that they could sell the authorizations for profit. *Id.* at 6503 (the Communications Act "does not bar the for-profit sale to a private party, subject to prior Commission approval, of whatever private rights a permittee has in its license"). However, *Welch* did not reverse the Commission's interpretation of the Communication Act regarding security interests in licenses; *Welch* did not even address this issue. In addition, as Tak points out, the Commission recognized before *Welch* that a licensee does have some rights in the licenses. *See In re Fugazy Express, Inc.*, 114 B.R. 865 (Bankr.S.D.N.Y.1990), *aff'd*, 124 B.R. 426 (S.D.N.Y.1991) (debtor's interest in broadcast license is property of debtor's estate for bankruptcy purposes); *see also L.B. Wilson, Inc. v. FCC*, 170 F.2d 793, 798 (D.C.Cir.1948) ("A broadcast license is a thing of value to the person to whom it is issued and a business conducted under it may be the subject of injury."). *Welch*'s expansion of licensees' rights in the particular area of selling bare authorizations for unbuilt cellular service facilities does not suggest that licensees can treat the licenses as property for all purposes, including the granting of security interests.

The Commission cited its *Merkley II* decision with approval in *In re Omega Cellular Partners*, 5 F.C.C.R. 7624 (1990). In *Omega*, the Commission granted an application for a license although the applicant

had granted its creditor a security interest in the license to the extent permitted by law. The Commission explained that "[it is well established ... that the Commission does not recognize a security interest in a license, and that credit cannot be extended in reliance upon the license as an asset from which a licensee's obligations may be satisfied." 5 F.C.C.R. at 7624 (citing *Merkley II*, 56 R.R.2d at 416; *Minority Ownership in Broadcasting*, 99 F.C.C.2d at 1253). The Commission granted the application despite the provision, finding that the creditor understood security interests were not permitted by law and that the provision was harmless because it permitted the security interest only to the extent permitted by law. *Omega*, 5 F.C.C.R. at 7624.

I disagree with the banks that *Omega* was a "mere staff decision" and therefore should not be given much weight. *Omega* is directly on point. As in *Omega*, the agreement between the banks and Tak gives the banks a security interest in the license "*to the extent* that such rights are assignable." Security Agreement, § 1(b). The Security Agreements give the banks a security interest in the licenses only to the extent permitted by law. The FCC does not permit security interests in broadcast licenses, and thus the provision is unenforceable under current law. *Omega*, 5 F.C.C.R. at 7624.[4]

In sum, it is clear from the cases discussed above that at the present time the FCC does not permit security interests in licenses. *See also* Howard Liberman and Gerald Stevens–Kittner, "Lending to Broadcast Stations," *Loan Officer's Legal Alert* at 5, 6 (Sept. 1989) ("The lender can perfect a security interest in all the assets of the company other than the FCC license."); *see also* Whitley, "A Primer on Commercial Transactions Under the Communications Act," 72 *Ill.B.J.* 26, 30 (1983) ("no direct attachment [of a security inter-

est] can be made to a license"). This policy appears to be based primarily on an interpretation of § 301. *See Radio KDAN II*, 13 R.R.2d at 102. Under this policy, the banks' "limited" security interest in the proceeds from the sale of the license does not exist because the banks seek essentially to place a lien on the licenses, and that is not permitted by the FCC. *Merkley I*, 94 F.C.C.2d at 830; *Omega*, 5 F.C.C.R. at 7624. The only authority the banks offer that contradicts this conclusion is *In re Ridgely*, 1991 Bankr.LEXIS 1921 (Nov. 20, 1991), an unpublished decision by a bankruptcy court that did not explain the basis for its conclusion. The parties have set forth several public interest and economic policy arguments in favor of and against the rule. These arguments belong before the FCC; it is not the court's role to weigh the competing economic policy arguments to determine whether the rule is wise or should be changed.

*Preemption*

■■■ The banks argue that state law gives them a right to a perfected security interest and that Congress has not preempted that right, regardless of FCC policy. In the alternative, the banks argue that even if the FCC policy preempts state law, this court does not have jurisdiction to enforce the policy.

It is well established that a federal agency may preempt state laws when it acts within its scope of authority. *City of New York v. FCC*, 486 U.S. 57, 63–64, 108 S.Ct. 1637, 1641–42, 100 L.Ed.2d 48 (1988); *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990). Congress granted the FCC "broad authority" to regulate radio transmissions when it passed the Communications Act, *FCC v. Midwest Video Corp.*, 440 U.S. 689, 696, 99 S.Ct. 1435, 1439, 59 L.Ed.2d 692 (1979), and when it gave the Commission exclusive authority over licensing, *Radio Station*

---

4. On March 16, 1992, Tak submitted a document that purports to be an FCC release inviting public comment regarding "[w]hether ... the Commission should amend its rules to allow former licensees and third parties to hold security and reversionary interests in broadcast licenses." Also, Tak submitted a transcript of an FCC meeting that resulted in the release in which several members refer to the FCC's policy against security interests in licenses. The banks argue that these documents are not legally relevant because they are not an FCC order. I am not considering these documents.

*WOW, Inc. v. Johnson,* 326 U.S. 120, 127–8, 130–31, 65 S.Ct. 1475, 1481–82, 89 L.Ed. 2092 (1945); *see also ON/TV of Chicago v. Julien,* 763 F.2d 839, 842 (7th Cir.1985). The banks do not argue that the FCC's policy falls outside its congressional grant of authority. *See City of New York v. FCC,* 486 U.S. at 64, 108 S.Ct. at 1642. It is clear that a state law permitting the banks to have a security interest in FCC licenses would conflict directly with the FCC's policy against such security interests and would be preempted by federal law. *See Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984) (preemption occurs "when compliance with both state and federal law is impossible").[5] That the policy was not created through rulemaking procedures does not diminish its force of law. Agencies may establish rules of general application through individual adjudication. *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974), *overruled on other grounds by NLRB v. Hendricks County Rural Elec. Membership Corp.,* 454 U.S. 170, 102 S.Ct. 216, 70 L.Ed.2d 323 (1981); *South Central Bell Tel. Co. v. Louisiana Pub. Serv. Comm'n,* 744 F.2d 1107, 1115 (5th Cir.1984), *vacated on other grounds, Louisiana Publ. Serv. Comm'n v. South Central Bell Tel. Co.,* 476 U.S. 1166, 106 S.Ct. 2884, 90 L.Ed.2d 972 (1986); *see also Omega,* 5 F.C.C.R. at 7624 (security interest in license not permitted by law).

## Jurisdiction

The banks argue that the bankruptcy court did not have jurisdiction to enforce the FCC policy prohibiting security interests because "only the FCC has jurisdiction to determine in the first instance whether the right of a licensee to grant a security interest is consistent with the public interest in broadcasting." The banks cite 47 U.S.C. § 401(b) to support their argument that Tak's only recourse is to seek an order of the FCC in an appropriate proceeding and then bring the order to this court to enforce it. According to this argument, the courts may not attempt to predict what the FCC might do if this case were before them, and the courts do not have jurisdiction to enforce an FCC rule until the FCC enters an order against a bank.

■■■ 47 U.S.C. § 401(b) is not applicable in this instance. Section 401(b) empowers an injured party to apply to a district court for enforcement of an order of the Commission. Tak and the unsecured creditors do not seek the enforcement of a Commission order; they oppose the banks' assertion that their lien is valid under federal law. The banks are the parties who initiated this action, seeking a declaration that their lien was valid under applicable law. To declare the lien invalid, the court must necessarily "enforce" a rule established by the Commission, but that does not transform this case into one under § 401(b). In every case cited by the banks, the plaintiffs sought to enjoin persons or entities that were violating an FCC decision. *See, e.g., New England Tel. and Tel. Co. v. Pub. Util. Comm'n,* 742 F.2d 1 (1st Cir.1984), *cert. denied,* 476 U.S. 1174, 106 S.Ct. 2902, 90 L.Ed.2d 988 (1986) (private party sought to enforce decision of FCC against state utilities commission); *Alltel Tennessee, Inc. v. Tennessee Pub. Serv. Comm'n,* 913 F.2d 305 (6th Cir.1990) (private party sought to enforce FCC decision against state public service commission). The banks offer no support for their assertion that this court cannot apply federal law to a dispute concerning the validity of a lien unless an order declaring the lien invalid is first issued by the FCC.[6]

---

**5.** Contrary to the banks' contention, they do not have a perfected security interest under state law. Article 9 of the Uniform Commercial Code states expressly that it does not apply "[t]o a security interest subject to any statute of the United States to the extent that such statute governs the rights of parties to and third parties affected by transactions in particular types of property." *See* Mass.Gen.L. ch. 106, § 9–104(a) (the security agreement designates Massachu-

setts law as the law governing the transaction). As discussed above, the FCC has a policy prohibiting security interests in broadcast licenses; thus the U.C.C. would not apply.

**6.** Even if § 401(b) did apply, the banks' argument that there is no "order" to be enforced is meritless. The Seventh Circuit Court of Appeals has held by implication that private parties may enforce an FCC decision that applies generally.

In essence, the banks are asking this court to enforce their liens in the licenses without regard to whether such an interest is permitted under federal law. Declaring the banks' lien valid, however, would lead to an absurd result: Tak would have to go before the Commission to obtain a ruling enforcing the Commission's own rule against security interests in broadcast licenses and would then have to come back to this court to seek enforcement of the Commission's ruling. Fortunately, nothing in the Communications Act compels that result. Federal courts have jurisdiction to determine the validity of a lien asserted against the estate of a debtor, 28 U.S.C. § 157(b)(2)(K), and to apply federal law.

■ Additionally, the doctrine of primary jurisdiction has no applicability here. This is not a case in which the FCC has yet to decide an issue or where its stance is ambiguous; this is a case in which the FCC has established a clear policy that the banks now seek to escape. *Cf. Mid–Plains Tel. Co. v. Pub. Serv. Comm'n*, 745 F.Supp. 1450 (W.D.Wis.1989). This case does not require the court to rule on the merits of an application for the assignment or renewal of a license, or to weigh competing policies to determine which policy best serves the public interest. To the contrary, it requires the court to determine only whether federal law permits the banks' security interests in the FCC license. The answer is clear: it does not.

*Motion to Strike Affidavits*

Tak appeals from the bankruptcy court's denial of its motion to strike certain affidavits submitted by the banks. The banks admitted at the bankruptcy hearing that these affidavits were immaterial to the summary judgment motions before the

court, and the bankruptcy judge agreed; the affidavits were immaterial to deciding the legal effect of the credit and security agreements. Tak appealed the decision to ensure that if this court reversed the bankruptcy judge, it would not consider these affidavits in its decision. Because I have affirmed the bankruptcy's judge's conclusion of law that the banks do not have a perfected security interest in the license, it is unnecessary to determine whether the affidavits comply with Fed.R.Civ.P. 56(b). They are immaterial. The bankruptcy judge's denial of Tak's motion to strike the affidavits is affirmed.

### ORDER

IT IS ORDERED THAT the bankruptcy judge's decision granting summary judgment to Tak Communications and denying summary judgment to the banks is AFFIRMED.

FURTHER IT IS ORDERED THAT the bankruptcy judge's denial of Tak Communications' motion to strike affidavits is AFFIRMED.

*See Illinois Bell Tel. Co. v. Illinois Commerce Comm'n*, 740 F.2d 566, 571 (7th Cir.1984) (private parties may seek injunction against Commission under 47 U.S.C. § 401(b) to enforce FCC order freezing rates); *see also South Central Bell Tel. Co. v. Louisiana Pub. Serv. Comm'n*, 744 F.2d 1107, 1115, 1118 (5th Cir. 1984) (§ 401(b) allows private enforcement of FCC rules and regulations); *Alltel Tennessee, Inc. v. Tennessee Pub. Serv. Comm'n*, 913 F.2d 305, 308 (6th Cir.1990) (order resulting from

rulemaking proceeding is an "order" within § 401(b)); *but see New England Tel. & Tel. Co. v. Public Util. Comm'n*, 742 F.2d 1, 4–7 (1st Cir.1984) (common carrier may not enforce general FCC policy against state commission). Additionally, it is well settled that agencies may establish rules of general application through rulemaking or through individual adjudication. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *South Central Bell Tel. Co.*, 744 F.2d at 1115.