**In re THOMAS COMMUNICATIONS, INC., Debtor.**

**THOMAS COMMUNICATIONS, INC., Plaintiff,**

**v.**

**ALLIED FINANCIAL CORPORATION II; Allied Financial Corporation; Allied Venture Partnership; Mills Broadcasting, Inc.; Bank of Paden City; Internal Revenue Service, Department of Treasury of the United States of America; Mort Victorson, Trustee of the Bankruptcy Estate of Thomas Communications, Inc., Defendants.**

Bankruptcy No. 92–20276.
Adv. No. 93–0047.

United States Bankruptcy Court,
S.D. West Virginia,
Charleston Division.

Nov. 30, 1993.

---

John A. Rollins, Charleston, WV, for Thomas Communications, Inc.

Richard Francis and William Booker, Charleston, WV, for Allied Financial et al.

John Kamlowsky, Wheeling, WV, for Bank of Paden City.

Raymond Dodson, Charleston, WV, for trustee.

D. Scott Clark, Dept. of Justice, Washington, DC, for IRS.

## MEMORANDUM OPINION

L. EDWARD FRIEND, II, Bankruptcy Judge.

On March 11, 1992, Thomas Communications, Inc. (hereinafter "Thomas") filed its petition for relief under Chapter 11 of the Bankruptcy Code. 11 U.S.C. § 1101 *et seq.* As debtor-in-possession, Thomas operated two radio stations, WKKW (FM) of Clarksburg, West Virginia, and WBES (FM) of Charleston, West Virginia. Thomas held FCC broadcasting licenses to operate both stations. By order entered September 24, 1992, this Court granted Allied Financial Corporation II, Allied Financial Corporation and Allied Venture Partnership's (hereinafter "the Allied companies") motion for the appointment of a trustee. Mort Victorson was appointed trustee and continued to operate the two radio stations. In compliance with FCC regulations, the broadcast licenses were transferred to the trustee.

By order entered October 1, 1992, this Court authorized the trustee to borrow up to $100,000 from Allied Financial Corporation to fund the continued operations of the two radio stations. Pursuant to that order, Allied advanced to the trustee $27,000 and was granted an administrative expense super-priority claim over any and all administrative expenses. The entire principal amount plus interest remains unpaid and outstanding.

The Allied companies state that they hold two additional claims against Thomas. The first claim, evidenced by a Senior Promissory Note dated June 21, 1990, is for $1,897,-630.83. The second claim, evidenced by a Subordinated Debenture dated June 21, 1990, is in the amount of $711,033.91. As of the date of the filing of the petition in bankruptcy, the total of the two claims was $2,608,664.74. The notes and security agreements were perfected by the filing of UCC–1 financing statements. The financing statements cover property including, but not limited to, "licenses (including specifically but without limitation the FCC broadcast licenses on the list attached to this Financing Statement as 'EXHIBIT B,' all subject to F.C.C. approval of transfer), accounts receivable, and all tangible and intangible assets now owned or later acquired." The proceeds of such collateral are also covered. These financing statements were filed in or around June, 1990.

Prior to debtor's transactions with the Allied companies, debtor borrowed monies on several occasions from the Bank of Paden City (hereinafter "the Bank"). Of particular importance to the subject proceedings, on April 11, 1989, the Bank, lent debtor $75,000. As security for this loan, the Bank enjoyed a security interest in debtor's accounts receivable and "all **general intangibles** I own now or may own in the future including, **but not limited to,** tax refunds, applications for patents, patents, copyrights, trademarks, trade secrets, goodwill, trade names, customer lists, permits and franchises, and the right to use my name." *See* Bank Exhibit No. 3 from hearing of September 3, 1993. UCC–1 financing statements were filed which covered "all accounts receivable now owned or hereafter created, located in New Martinsville, West Virginia, or any other location debtor wishes to do business and all general intangibles I own now or may own in the future." *See* Bank Exhibits Nos. 4 and 5 from hearing of September 3, 1993.

The Allied companies allege that its loan commitments were conditioned upon the Bank releasing its lien. The Bank contends that it was to release its lien only upon the proceeds from the Allied companies' loans

being applied toward paying off the Bank's loan. The Bank contends that it did not release its lien and, thus, still maintains its perfected security interest.

By order entered February 4, 1993, the Court authorized the trustee to sell all of the assets of the two radio stations, except for the accounts receivable, free and clear of liens and encumbrances. The Court ordered that the proceeds of sale be paid over to the Allied companies, with all liens that attached to the assets being sold, attaching with the same validity and to the same extent, to the proceeds of sale. The transfer of the broadcast licenses, from the trustee to the purchasers, remains subject to F.C.C. approval. The trustee's sale of the assets of WKKW (FM) has been concluded. The purchase of these assets was financed by the Allied companies. The proceeds of sale are a promissory note in the amount of $1.2 million, made payable to the trustee, and assigned by him to the Allied companies. The sale of the Charleston station was to have been concluded earlier in this year. The purchase price was to have been approximately $1 million.

As between the Bank and the Allied companies, a dispute arose as to the priority of lien status regarding the accounts receivable and any proceeds from the sale of the F.C.C. licenses. In an order dated July 28, 1993, this Court found that, as to the accounts receivable, the Bank held a lien superior to the Allied companies, such lien having not been released.

As between these parties, two issues remain outstanding. First, whether a party may hold a properly perfected security interest in proceeds from an F.C.C.-approved sale of a broadcasting license. Second, assuming such security interest is allowed, whether the Allied companies or the Bank holds the superior lien.

A third party also has an interest in the subject matter. The Internal Revenue Service filed federal tax liens against the debtor: one on March 15, 1991, and the other on May 21, 1991. The amount of taxes reflected on these liens was $93,473.96. As of the date the debtor filed its petition in bankruptcy, the amount due and owing the I.R.S. was $102,191.12. Based upon Internal Revenue

Code Sections 6321 through 6323, 26 U.S.C. §§ 6321–23, the I.R.S. claims that it is entitled to a first priority lien on the debtor's accounts receivable earned between the 46th day after the filing of its notices of federal tax lien and the date of the bankruptcy petition, an amount to be established at the trial on this matter. Therefore, this Court shall resolve a third issue as raised by the I.R.S.: whether, notwithstanding the resolution of the above issues, the I.R.S.'s liens put it in a superior position regarding the accounts receivable.

The procedural posture of this case follows: By order of February 3, 1993, this Court entered an order authorizing the trustee to sell certain assets free and clear of liens. Subsequent thereto, several objections were filed. On or around April 7, 1993, debtor filed a complaint for declaratory judgment which raised issues similar to those raised in the objections to the order authorizing the sale.[1] By order entered on or around May 27, 1993, the Court consolidated the issues under the adversary proceeding. On May 11, 1993, the Chapter 11 trustee filed a motion for summary judgment and memorandum of law in support of the motion. The other parties filed their respective memorandums in support of their positions. By further order dated July 28, 1993, this Court set the remaining issues and directed the parties to file their respective briefs.

The first issue which this Court shall consider is whether a party may hold a properly perfected security interest in proceeds from an F.C.C.-approved sale of a broadcasting license by filing UCC–1 financing statements which describe the collateral as general intangibles or "licenses (including specifically but without limitation the F.C.C. broadcast licenses ..., all subject to F.C.C. approval of transfer), and all proceeds ... thereof...." There are essentially two leading bankruptcy court decisions addressing issues related to transfers of F.C.C. licenses. Those cases are *Ridgely Communications, Inc.*, 139 B.R. 374

(Bankr.D.Md.1992), and *In re Tak Communications, Inc.*, 138 B.R. 568 (W.D.Wis.1992), *aff'd* 985 F.2d 916 (7th Cir.1993).

The circumstances in *Ridgely* are parallel with those in the subject case. The debtor in *Ridgely* engaged in the business of owning and operating two radio stations. While operating under Chapter 11, the bankruptcy court authorized the sale of the radio stations. The sale included all of the debtor's assets, including the broadcasting licenses. The closing documents and sale proceeds were escrowed pending final approval of the sale by the F.C.C. The F.C.C. ultimately approved the sale. A fully secured creditor held a first priority lien against all the debtor's tangible and intangible property, and filed a motion to distribute the net proceeds. The debtor filed a partial objection, claiming that the secured creditor's lien did not extend to the proceeds of the radio station licenses.

The court in *Ridgely* began by recognizing that broadcasting licenses, upon the debtor's filing its petition in bankruptcy, become property of the bankruptcy estate pursuant to Bankruptcy Code § 541. 11 U.S.C. § 541. *See Ridgely* at 376. *See also Tak* at 576, 985 F.2d 916, 918 (7th Cir.1993). Those courts also recognized that the general policy of the F.C.C. is that a lender/creditor may not perfect a security interest in broadcast licenses. *See Ridgely* at 376. *See also Tak*, 985 F.2d 916, 918–19. The *Ridgely* and *Tak* courts begin their divergence here.

Citing *In re Bill Welch*, 3 F.C.C.R. 6502 (available on Westlaw FCom–FCC database), 1988 F.C.C. LEXIS 1927 (1988), the court in *Ridgely* stated that the F.C.C. has recognized that a licensee possesses some property interest, albeit limited, in a broadcasting license under which such licensee operates. In *Welch*, the Commission addressed the issue of whether the for-profit transfer of control or sale of a cellular authorization for unbuilt facilities is consistent with Sections

---

1. This Court recognizes that Thomas Communications, Inc. was no longer a debtor-in-possession at the time it filed the adversary proceeding and, thus, a question arose as to whether only the Chapter 11 trustee was the proper party to have acted on behalf of the debtor or the debtor-in-possession. However, the parties agreed that, because the other issues before the Court would arise regardless of the Court's resolving this question, it would be most efficient to decide the issues under the current posture.

301 and 304 of the Communications Act of 1934, as amended. 47 U.S.C. §§ 301 and 304. The Communications Act sections analyzed in *Welch* are the same sections over which other courts appear to argue whether, and the extent to which, security interests in F.C.C. licenses are allowed. Reversing its previous indications, the Commission concluded that the statutory provisions do not require it to prohibit the for-profit sale of "bare" Commission authorizations for unbuilt facilities. *See Welch,* 1988 F.C.C. LEXIS 1927 at \*10. "Accordingly, . . . we are changing our prior interpretation of Sections 301 and 304 and permitting such transactions in the cellular service." *Id.* In the context of a sale of authorizations for stations, the Commission stated that the language of the subject sections addressed Congressional concerns that the federal government **"retain ultimate control over radio frequencies, as against any rights, especially property rights, that might be asserted by licensees who are permitted to use the frequencies."** *Id.* at \*11 (emphasis added). The Commission found that the language did not bar the for-profit sale to a private party, **"subject to prior Commission approval"** of whatever private rights a permittee has in its license. *Id.* (emphasis added).

The court stated, via footnote:

The distinction between rights between private parties and the Commission and rights between only private parties is a critical one: "The jural relationships that attach from their relationship between transferor and transferee must be distinguished and differentiated from those in relationship to the regulatory authority. There is a qualitative difference in the rights and obligations which an assignor asserts against an assignee as compared to the assertion of rights by transferor and transferee against the Commission's regulatory powers."

*Id.* at n. 28. The Commission also stated that this comported with legislative history whereby it was stated by a senator on the senate floor that the predecessors to Sections 301 and 304 protect the public against a **licensee** securing **vested rights** under the provisions of the Act. *Id.* at \*12. Citing *To Regulate Radio Communications: Hearings Before the Commission on Merchant Marine and Fisheries, U.S. House of Representatives,* 69th Cong., 1st Sess. 11 (1926), the Commission stated that the Secretary of Commerce, Herbert Hoover, the prime administration initiator of the Radio Act, "made clear that the ownership restrictions **related to a licensee's rights vis-a-vis the Federal Government, not its rights to make a profit from its authorization upon a transfer of assignment approved by the Commission . . . .**" *Id.* at \*13, 14 (emphasis added). This Court interprets the Commission's conclusion to be that the underlying objective of the provision was simply that no proprietary interests in a license could be asserted against the F.C.C.

The Commission recognized that another section of the Act dealt with the assignment and transfer of authorizations between private parties and that such section contained no prohibition of for-profit transfers of construction permits. The Commission found that such section merely required that all transfers and assignments are to be judged by the Commission under the general public interest, convenience and necessity test. *Id.* at \*15.

The court in *Ridgely* stated that the Commission's distinction in *Welch,* that rights between licensees and the Commission are to be distinguished from rights between the licensee and a private third party, is what permits a licensee to receive a profit from the transfer of a license to a third party. The limited nature of the security interest claimed by the secured party in *Ridgely* implicates none of the Commission's concerns. The secured party in *Ridgely* was not asserting any interest in the rights of the licensee with respect to the F.C.C. "The right to transfer a license is a right between the F.C.C. and the licensee; the right to receive remuneration for the transfer is a right with respect to the two private parties. It is this limited right in which [the secured party] claims to have perfected its security interest." *See Ridgely* at 378, 379. Specifically, the court in *Ridgely* held that a creditor may perfect a security interest in an F.C.C. broadcasting license, limited to the extent of

the licensee's proprietary rights in the license vis-a-vis private third parties. *Id.* at 379.

The right of the licensee crucial to this decision (and the only right recognized by the Court in this case) is the right of the creditor to claim proceeds received by the debtor licensee from a private buyer in exchange for the transfer of the license to that buyer. The right to receive such proceeds is a private right of the licensee that constitutes a proprietary interest in which a creditor may perfect a security interest. It is this private right asserted against the assignee/transferee and not against the Federal government, in which [the secured creditor] may properly assert a security interest.

*Id.* See also State Street Bank & Trust Co., et al. v. Arrow Communications, et al., 833 F.Supp. 41 (D.Mass.1993) (unpublished).

█ The parties in the subject case are not claiming a security interest in the broadcasting license such that to rule in their favor would interfere with any rights or obligations which exist or existed within the relationship of the debtor and the F.C.C. The F.C.C. continues to retain ultimate control over the radio frequencies, "as against any rights, especially property rights, that might be asserted by licensees who are permitted to use the frequencies." *See Welch,* 1988 F.C.C. LEXIS 1927 at *11. The Commission's apparent concern over the protection of the public against a licensee securing vested rights under the provisions of the Act, remains intact. *Id.* at *12. Subject to the Commission's approval of sale, the only concern here is the priority between private third parties regarding their entitlement to the proceeds of sale. Upon the F.C.C.'s approval of the transfer of the broadcasting licenses, the only thing left for resolution is a determination of which party is entitled to the proceeds realized from the transfer. To the extent that either the Bank or the Allied companies may enforce a claim to proceeds resulting from an F.C.C.-approved sale of the licenses, the creditors may hold a perfected security interest.

The *Tak* case is inapposite. The bank initiated an adversary proceeding in the bankruptcy court seeking to declare the validity of its liens against Tak's rights under the F.C.C. licenses. "The banks sought a declaratory judgment that their security interests in Tak's rights under the FCC licenses and in Tak's right to sell the station as a going concern were a perfected lien." *See In re Tak Communications, Inc.,* 138 B.R. 568, 571 (W.D.Wis.1992). As stated succinctly by the court in *Arrow Communications,* "[t]hese claims by the banks ... squarely interfered with the FCC's regulation of its licensee, and conflicted with the FCC's policy that the licensee must be able to transfer his license freely." *See Arrow Communications* at 46 (footnote omitted). In finding that security interests in broadcasting licenses are not permitted by law, the court in *Tak* relies upon cases, each of which is distinguishable from the *Ridgely* and *Arrow Communications* cases, as well as the subject case. In each of the cases cited by the court in *Tak,* a creditor appears to attempt to restrict and interfere with the F.C.C.'s regulation of its licensee. *See Stephens Indus., Inc. v. McClung,* 789 F.2d 386 (6th Cir.1986) (former owner sought to stop the sale of the station to a third party, claiming that his mortgage was a lien on both the tangible assets and the F.C.C. licenses); *In re Smith,* 94 B.R. 220 (Bankr.M.D.Ga.1988) (creditor attempting to prevent trustee from transferring license); *In re Merkley,* 94 F.C.C.2d 829, *recon. denied,* 56 R.R.2d 413 (1984), *aff'd sub nom. Merkley v. F.C.C.,* 776 F.2d 365 (D.C.Cir.1985) (a court-appointed receiver filed an application with the F.C.C. for the involuntary assignment of a broadcast license); and *In re Radio KDAN, Inc.,* 11 F.C.C.2d 934 (1968), *recon. denied,* 13 R.R.2d 100 (1968), *aff'd sub nom. W.H. Hansen v. F.C.C.,* 413 F.2d 374 (D.C.Cir.1969) (seller of a station foreclosed on the personal and real property of the station and then sought to have the license transferred back to it after the buyer's default) [2].

---

**2.** The court stated that such clause was "void ab initio since it attempts to retain for Hansen a reversionary interest in the KDAN license, and as such is expressly forbidden by ... our rules." *See Tak* 138 B.R. at 575 (citing *KDAN*).

This Court is also cognizant of the fact, as one party pointed out, that the facts and issues in this case are not precisely those which the Commission addressed in *Welch.* The Commission in *Welch* addressed whether the for-profit transfer of control or sale of a cellular authorization for unbuilt facilities is consistent with Sections 301 and 304 of the Communications Act of 1934, as amended. That the circumstances in the subject case are different than those in *Welch,* amounts to distinctions without a difference. Essentially, the Commission in *Welch* stressed the F.C.C.'s main concerns when confronting issues relating to use and control of F.C.C. broadcasting licenses. This Court's analysis is fully consistent with the apparent concerns of the Commission and other courts.

The second issue which this Court shall address will be, as between the Bank and the Allied companies, which creditor has a prior lien on the accounts receivable and general intangibles, including, but not limited to, the limited security interest in the proceeds attributable to the F.C.C. license transfers subject to F.C.C. approval. In the order dated July 28, 1993, this Court found that at the conclusion of the July 27, 1993 hearing "... the Bank would have a prior lien, as its lien had not been released." Because the Bank has appropriately filed UCC–1 financing statements in conjunction with the April 11, 1989 loan, and such financing statements remain effective, this Court finds that, as to the accounts receivable, the Bank remains a prior perfected secured creditor in relation to the Allied companies. *See* W.Va.Code §§ 46–9–401, 46–9–403.

■ As to the proceeds associated with the transfer of the F.C.C. licenses, this Court starts with the proposition that, under Article 9 of the Uniform Commercial Code, "general intangibles" are defined as "any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money." *See* W.Va. Code § 46–9–106 (Supplement 1993). As

stated by the court in *Ridgely,* governmental licenses of all types are generally considered to be "general intangibles" as contemplated by this statute. *See Ridgely* at 379 (citations omitted). For the same reasons the Bank continues to hold a prior perfected security interest in the accounts receivable, it also holds a prior perfected security interest in the proceeds related to the transfer of the F.C.C. licenses.

The final issue which needs determining is, notwithstanding the above, whether the I.R.S.'s lien puts the I.R.S. in a position ahead of either or both the Bank or the Allied companies in relation to the accounts receivable.

■ The I.R.S.'s lien recorded on March 15, 1991, was for taxes in the amount of $71,382.52. The I.R.S.'s tax lien filed on May 21, 1991, was for taxes owed in the amount of $22,091.44. Internal Revenue Code Section 6321 grants the Internal Revenue Service a lien upon all property and rights to property, whether real or personal, belonging to the debtor.[3] 26 U.S.C. § 6321. Each of the parties, the Bank, the Allied companies, and the Internal Revenue Service claim a priority interest in the debtor's accounts receivable, regardless of the Internal Revenue Service lien.

■ Internal Revenue Code § 6323(a), 26 U.S.C. § 6323(a), states that the lien imposed under § 6321 shall not be valid against any holder of a security interest, unless notice thereof has been filed. The implied harshness of this provision is tempered by Internal Revenue Code § 6323(c), 26 U.S.C. § 6323(c). The substance of this subsection gives the Internal Revenue Service priority over the holder of a prior perfected security interest in accounts receivable only to a limited extent. Beginning with the 46th day after the Internal Revenue Service has properly recorded its lien, all accounts receivable earned on that day and thereafter shall inure to the

**3.** Internal Revenue Code § 6321 states
    If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty,

together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

benefit of the I.R.S. until its lien is satisfied.[4] Based upon this Court's interpretation of the language in Internal Revenue Code § 6323(c), and consistent with the court's analysis in *Shawnee State Bank v. United States*, 735 F.2d 308 (8th Cir.1984), the Internal Revenue Service shall have priority over the Bank and the Allied companies to the following extent: beginning the 46th day after March 15, 1991 (i.e., April 30, 1991), the Internal Revenue Service shall have priority in any accounts receivable earned on that day and thereafter until its lien, in the amount of $71,382.52, is satisfied in full; beginning the 46th day after May 21, 1991 (i.e., July 6, 1991), the Internal Revenue Service shall have priority in any accounts receivable earned on that day and thereafter until its lien of $22,091.44 is satisfied in full. *See Shawnee State Bank v. United States*, 735 F.2d 308 (8th Cir.1984).

An order shall be entered in accordance with the above findings.

---

**4.** Internal Revenue Code § 6323(c) states

   (1) ... To the extent provided in this subsection, even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which—

   (A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting—

   (i) a commercial transaction financing agreement....

   (2) ... For purposes of this subsection—

   (A) ... The term "commercial transactions financing agreement" means an agreement (entered into by a person in the course of his trade or business)—

   (i) to make loans to the taxpayer or to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business....

   (B) ... The term "qualified property", when used with respect to a commercial transactions financing agreement, includes only commercial financing security acquired by the taxpayer before the 46th day after the date of tax lien filing.

   (C) ... The term "commercial financing security" means ... accounts receivable....