# CITY OF NEW YORK ET AL. *v.* FEDERAL COMMUNICATIONS COMMISSION ET AL.

No. 87–339.   Argued March 29, 1988—Decided May 16, 1988

White, J., delivered the opinion for a unanimous Court.

*Stephen J. McGrath* argued the cause for petitioners. With him on the briefs were *Doron Gopstein, Leonard J. Koerner, Paul S. Ryerson, Robert Alan Garrett, Patrick J. Grant, Cynthia Pols, Lucia A. Dougherty,* and *Edward J. Walsh, Jr.*

*Deputy Solicitor General Wallace* argued the cause for the federal respondents. With him on the brief were *Solicitor General Fried* and *Diane S. Killory*. *H. Bartow Farr III* argued the cause for respondent National Cable Television Association, Inc. With him on the brief were *Brenda L. Fox, Michael S. Schooler,* and *Seth A. Davidson.**

---

*Briefs of *amici curiae* urging reversal were filed for Montgomery County, Maryland, et al. by *James J. Wilson, Nicholas P. Miller, W. Ran-*

JUSTICE WHITE delivered the opinion of the Court.

The Federal Communications Commission has adopted regulations that establish technical standards to govern the quality of cable television signals and that prohibit local authorities from imposing more stringent technical standards. The issue is whether in doing so the Commission has exceeded its statutory authority.

## I

This case deals with yet another development in the ongoing efforts of federal, state, and local authorities to regulate different aspects of cable television over the past three decades. See *Capital Cities Cable, Inc.* v. *Crisp,* 467 U. S. 691, 700–705 (1984); *United States* v. *Southwestern Cable Co.,* 392 U. S. 157, 161–178 (1968). With the incipient development of cable television in the 1950's and 1960's from what had been more generally known as community antenna television systems, the Federal Communications Commission began to assert regulatory authority in this area. See *CATV Second Report and Order,* 2 F. C. C. 2d 725 (1966). In 1972, the Commission first asserted authority over technical aspects of cable television and devised technical standards to govern the transmission of broadcast signals by cable, though without pre-empting regulation of similar matters by state or local franchising authorities. *Cable Television Report and Order,* 36 F. C. C. 2d 143, on reconsideration, 36 F. C. C. 2d 326 (1972), aff'd *sub nom. American Civil Liberties Union* v. *FCC,* 523 F. 2d 1344 (CA9 1975).[1] Within two years, however, the Commission became convinced from its experience

*dolph Young,* and *Larrine S. Holbrooke;* and for the U. S. Conference of Mayors et al. by *Benna Ruth Solomon* and *Beate Bloch.*

[1] The "technical standards" established by the Commission describe, in quantitative terms, various electrical characteristics of the audio and video components of the signals delivered by the cable system to its subscribers, including such specific items as visual carrier frequency, aural center frequency, visual signal level, terminal isolation, and radiation and signal leakage. See 47 CFR §§ 76.601, 76.605 (1987).

with conflicting federal and local technical standards that there is "a compelling need for national uniformity in cable television technical standards" which would require it to pre-empt the field of signal-quality regulation in order to meet the "necessity to rationalize, interrelate, and bring into uniformity the myriad standards now being developed by numerous jurisdictions." *Cable Television Report and Order,* 49 F. C. C. 2d 470, 477, 480 (1974). The Commission explained that a multiplicity of mandatory and nonuniform technical requirements undermined "the ultimate workability of the over-all system," could have "a deleterious effect on the development of new cable services," and could "seriously imped[e]" the "development and marketing of signal source, transmission, and terminal equipment." *Id.,* at 478–479.[2]

In 1984, the Court approved the pre-emptive authority that the Commission had asserted over the regulation of cable television systems. We held that in the Communications Act of 1934, Congress authorized the Commission "to regulate all aspects of interstate communication by wire or radio," including the subsequently developed medium of cable television, and that the Commission's authority "extends to all regulatory actions 'necessary to ensure the achievement of the Commission's statutory responsibilities.'" *Crisp, supra,* at 700, quoting *FCC* v. *Midwest Video Corp.,* 440 U. S. 689, 706 (1979). Although the state law that was invalidated in *Crisp* regulated commercial advertising on

---

[2] Although the Commission recognized that "[t]he broad pre-emptive policy we are adopting today will ultimately affect all cable systems," 49 F. C. C. 2d, at 480, it fashioned this policy to have a more gradual effect. Because "many of the pre-existing technical standards adopted by cities and states cannot be shown to adversely affect our stated goals," the Commission decided to extend a "grandfather" approval to those technical standards that were already operational or certified to the Commission by January 1, 1975. *Ibid.* In addition, a mechanism was established (and remains in effect) that allows state and local authorities to impose "different or additional technical standards" if they obtain a specific waiver from the Commission. *Id.,* at 480–481; see n. 5, *infra.*

cable television, rather than the technical quality of cable television signals, the Court recognized that for 10 years the Commission had "retained exclusive jurisdiction over all operational aspects of cable communication, including signal carriage and technical standards." *Crisp, supra,* at 702.

A few months after the Court's decision in *Crisp,* Congress enacted the Cable Communications Policy Act of 1984 (Cable Act or Act), 98 Stat. 2780, 47 U. S. C. §§ 521–559 (1982 ed., Supp. IV). Among its objectives in passing the Cable Act, Congress purported to "establish a national policy concerning cable communications" and to "minimize unnecessary regulation that would impose an undue economic burden on cable systems." 47 U. S. C. §§ 521(1), (6) (1982 ed., Supp. IV). The Act was also intended to "establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems" through procedures and standards that "encourage the growth and development of cable systems and which assure that cable systems are responsive to the needs and interests of the local community." §§ 521(3), (2) (1982 ed., Supp. IV).

The Cable Act left franchising to state or local authorities; those authorities were also empowered to specify the facilities and equipment that franchisees were to use, provided such requirements were "consistent with this title." Cable Act, §§ 624(a),(b), 47 U. S. C. §§ 544(a),(b) (1982 ed., Supp. IV). Section 624(e) of the Cable Act provided that "[t]he Commission may establish technical standards relating to the facilities and equipment of cable systems which a franchising authority may require in the franchise." 47 U. S. C. § 544(e) (1982 ed., Supp. IV).

In 1985, the Commission promulgated regulations that would establish technical standards governing signal quality for one of four different classes of cable television channels and that would forbid local cable franchising authorities to impose their own standards on any of the four classes of channels. 50 Fed. Reg. 7801, 7802 (1985), 47 CFR pt. 76 (1986).

The Commission eventually adopted a modified version of these regulations, which reaffirmed the Commission's established policy of pre-empting local regulation of technical signal quality standards for cable television. 50 Fed. Reg., at 52462, 52464–52465. The Commission found its statutory authority to adopt the regulations in § 624(e) of the Cable Act, 47 U. S. C. § 544(e) (1982 ed., Supp. IV), and in 47 U. S. C. §§ 154(i) and 303(r). 50 Fed. Reg., at 52466. Petitioners (the cities of New York, Miami, and Wheaton, and the National League of Cities) sought review of the regulations in federal court, where they contested the scope of the pre-emptive authority claimed by the Commission and insisted that franchising authorities could impose stricter technical standards than those specified by the Commission.

The Court of Appeals granted partial relief to petitioners. 259 U. S. App. D. C. 191, 814 F. 2d 720 (1987). It noted that the Commission had adopted technical standards applicable to one class of cable television channels, but had left the other three classes of channels completely unregulated. It agreed with petitioners that the Commission had acted arbitrarily and capriciously when it did not adopt technical standards for the latter three classes of channels, yet prohibited local authorities from adopting such standards and ignored the apparent conflict between these actions and the language of the Cable Act. It therefore vacated this part of the rule and remanded to the Commission for further proceedings. The court's holding was unanimous on this point, and that part of its decision is not at issue here.[3]

---

[3] At argument, petitioners contended that the question of the Commission's statutory authority to regulate these other three classes of cable channels is properly presented to the Court in this case. Tr. of Oral Arg. 5–7, 9–10. We disagree. The Court of Appeals explicitly failed to resolve this question because it agreed "with petitioner's alternative argument that the FCC's . . . rulemaking was arbitrary and capricious." 259 U. S. App. D. C. 191, 197–198, 814 F. 2d 720, 726–727 (1987). The Court of Appeals' disposition with respect to these three classes of cable channels was to vacate those portions of the rule and to remand to the Commission for

The Court of Appeals divided, however, over the propriety of the Commission's technical standards that apply to the first class of cable channels and that pre-empt more stringent local regulations. The majority of the panel upheld preemption, ruling that Congress intended federal regulations like these to supersede local law and that the Commission acted within the broad confines of the pre-emptive authority delegated to it by Congress when it adopted the regulations with respect to this one class of channels. One judge dissented, contending that the majority had sanctioned preemption without a clear manifestation of congressional intent, contrary to this Court's decisions. We granted certiorari, 484 U. S. 962 (1987), and we now affirm.

## II

When the Federal Government acts within the authority it possesses under the Constitution, it is empowered to pre-empt state laws to the extent it is believed that such action is necessary to achieve its purposes. The Supremacy Clause of the Constitution gives force to federal action of this kind by stating that "the Laws of the United States which shall be made in Pursuance" of the Constitution "shall be the supreme Law of the Land." U. S. Const., Art. VI, cl. 2. The phrase "Laws of the United States" encompasses both federal statutes themselves and federal regulations that are properly adopted in accordance with statutory authorization. For this reason, at the same time that our decisions have established a number of ways in which Congress can be understood to have pre-empted state law, see *Louisiana Public Service Comm'n* v. *FCC*, 476 U. S. 355, 368–369 (1986), we have also recognized that "a federal agency acting within the scope of its congressionally delegated authority may pre-empt state

---

further proceedings. In their brief, moreover, petitioners refer specifically to "a vote of 2–1 [in] the Court of Appeals" in stating the questions presented, which was the disposition below only with respect to the one class of cable channels. Brief for Petitioners i.

regulation" and hence render unenforceable state or local laws that are otherwise not inconsistent with federal law. *Id.*, at 369.

This case involves the latter kind of pre-emption, and here the inquiry becomes whether the federal agency has properly exercised its own delegated authority rather than simply whether Congress has properly exercised the legislative power. Thus we have emphasized that in a situation where state law is claimed to be pre-empted by federal regulation, a "narrow focus on Congress' intent to supersede state law [is] misdirected," for "[a] pre-emptive regulation's force does not depend on express congressional authorization to displace state law." *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta*, 458 U. S. 141, 154 (1982). Instead, the correct focus is on the federal agency that seeks to displace state law and on the proper bounds of its lawful authority to undertake such action. The statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof. Beyond that, however, in proper circumstances the agency may determine that its authority is exclusive and pre-empts any state efforts to regulate in the forbidden area. *Crisp*, 467 U. S., at 700; *De la Cuesta, supra*, at 152–154. It has long been recognized that many of the responsibilities conferred on federal agencies involve a broad grant of authority to reconcile conflicting policies. Where this is true, the Court has cautioned that even in the area of pre-emption, if the agency's choice to pre-empt "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *United States* v. *Shimer*, 367 U. S. 374, 383 (1961); see also *Crisp, supra*, at 700.

## III

## A

In this case, there is no room for doubting that the Commission intended to pre-empt state technical standards governing the quality of cable television signals. In adopting the regulations at issue here, the Commission said:

"Technical standards that vary from community to community create potentially serious negative consequences for cable system operators and cable consumers in terms of the cost of service and the ability of the industry to respond to technological changes. To address this problem, we proposed in the *Notice* to retain technical standards guidelines at the federal level which could be used, but could not be exceeded, in state and local technical quality regulations.

.          .          .          .          .

"After a review of the record in this proceeding, we continue to believe that the policy adopted in 1974 was effective, should remain in force, and is entirely consistent with both the specific provisions and the general policy objectives underlying the 1984 Cable Act. This pre-emption policy has constrained state and local regulation of cable technical performance to Class I channels and has prohibited performance standards more restrictive than those contained in the Commission's rules. The reasons that caused the adoption of this policy appear to be as valid today as they were when the policy was first adopted." 50 Fed. Reg., at 52464.

As noted above, the policy adopted by the Commission in 1974, which was continued in effect by the 1985 regulations, was a pre-emptive policy applying in the area of technical standards governing signal quality. 49 F. C. C. 2d, at 477–481. Since the Commission has explicitly stated its intent to exercise exclusive authority in this area and to preempt state and local regulation, this case does not turn on

whether there is an actual conflict between federal and state law here, or whether compliance with both federal and state standards would be physically impossible. *De la Cuesta, supra,* at 153.

### B

The second part of the inquiry is whether the Commission is legally authorized to pre-empt state and local regulation that would establish complementary or additional technical standards, where it clearly is possible for a cable operator to comply with these standards in addition to the federal standards. We have identified at least two reasons why this part of the inquiry is crucial to our determination of the pre-emption issue. "First, an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it. Second, the best way of determining whether Congress intended the regulations of an administrative agency to displace state law is to examine the nature and scope of the authority granted by Congress to the agency." *Louisiana Public Service Comm'n,* 476 U. S., at 374. The second reason was particularly relevant in *Louisiana Public Service Comm'n* because there we were obliged to assess the import of a statutory section in which Congress appeared to have explicitly limited the Commission's jurisdiction, so as to prohibit it from pre-empting state laws concerning the manner in which telephone companies could depreciate certain plant and equipment. *Id.,* at 369–376, 379, construing 47 U. S. C. § 152(b).

We conclude here that the Commission acted within the statutory authority conferred by Congress when it pre-empted state and local technical standards governing the quality of cable television signals. When Congress enacted the Cable Act in 1984, it acted against a background of federal pre-emption on this particular issue. For the preceding 10 years, the Commission had pre-empted such state and local technical standards under its broad delegation of author-

ity to "[m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter [the communications laws, Title 47 of the U. S. Code, Chapter 5]," as a means of implementing its legitimate discretionary power to determine what the "public convenience, interest, or necessity requires" in this field. 47 U. S. C. §§ 303 and 303(r); see also 49 F. C. C. 2d, at 481; 47 U. S. C. § 154(i). The Court's decision in *Crisp*, which was handed down during the time Congress was considering the legislation that within a few months became the Cable Act, broadly upheld the Commission's pre-emptive authority in very similar respects. 467 U. S., at 701–705.

In the Cable Act, Congress sanctioned in relevant respects the regulatory scheme that the Commission had been following since 1974. In § 624 of the Cable Act, Congress specified that the local franchising authority could regulate "services, facilities, and equipment" in certain respects, and could enforce those requirements, but § 624(e) of the Act grants the Commission the power to "establish technical standards relating to the facilities and equipment of cable systems which a franchising authority may require in the franchise." 47 U. S. C. §§ 544(a)–(e) (1982 ed., Supp. IV). This mirrors the state of the regulatory law before the Cable Act was passed, which permitted the local franchising authorities to regulate many aspects of cable services, facilities, and equipment but not to impose technical standards governing cable signal quality, since the Commission had explicitly reserved this power to the Federal Government.

It is also quite significant that nothing in the Cable Act or its legislative history indicates that Congress explicitly disapproved of the Commission's pre-emption of local technical standards.[4] Given the difficulties the Commission had ex-

---

[4] Petitioners argue that by empowering local franchising authorities to take into account whether "the quality of the operator's service, including signal quality . . . has been reasonable in light of community needs," 47

perienced in this area, which had caused it to reverse its ground in 1974 after two years of unhappy experience with the practical consequences of inconsistent technical standards imposed by various localities, we doubt that Congress intended to overturn the Commission's decade-old policy without discussion or even any suggestion that it was doing so. To the contrary, the House Report which discusses this section of the Act portrays it as nothing more than a straightforward endorsement of current law:

> "Subsection (e) allows the Commission to set technical standards related to facilities and equipment required by a franchising authority pursuant to a franchising agreement. This provision does not affect the authority of a franchising authority to establish standards regarding facilities and equipment in the franchise pursuant to section 624(b) which are not inconsistent with standards established by the FCC under this subsection." H. R. Rep. No. 98–934, p. 70 (1984).

This passage from the House Report makes clear that the Act was not intended to work any significant change in the law in the respects relevant to this case. By noting that § 624(e) authorizes "the Commission to set technical standards related to facilities and equipment" and that it "does not affect the authority of a franchising authority to establish standards regarding facilities and equipment" that are not inconsistent with Commission standards, the House Report indicates both that Congress did not intend to remove from the Commission its longstanding power to establish pre-emptive

---

U. S. C. § 546(c)(1)(B) (1982 ed., Supp. IV), Congress implicitly recognized that local franchising authorities would need a comprehensive set of additional technical standards in order to carry out this task. Yet this argument simply ignores the fact that local authorities are able to assess signal quality against the technical standards set by the Commission, which it has found are adequate to ensure "an acceptable quality of service at the worst subscriber location and thus a better quality of service to the average subscriber." 50 Fed. Reg. 52462, 52463, n. 2 (1985).

technical standards, and that Congress did not intend to "affect the authority of a franchising authority" to set standards in these and similar matters regarding cable facilities and equipment. In particular, Congress did not manifest any intent to "affect the authority" of local franchising authorities by giving them the power to supplement the technical standards set by the Commission with respect to the quality of cable signals, a power which they generally had not been permitted to exercise for the last 10 years and which, according to the Commission's consistent view, disserves the public interest.[5] Petitioners insist that under § 624, as evidenced by the passage from the House Report quoted above, a franchising authority may specify any technical standards that do not conflict with Commission standards and hence may set stricter standards for signal quality. But this disregards the Commission's own power to pre-empt, an authority that we do not believe Congress intended to take away in the Cable Act. And it also disregards the Commission's explicit findings, based on considerable experience in this area, that complementary or additional technical standards set by state and local authorities do conflict with the basic objectives of federal policy with respect to cable television—findings that the Commission first articulated in 1974 and then reiterated in 1986. See 49 F. C. C. 2d, at 478–479; 50 Fed. Reg., at 52464–52465.

In sum, we find nothing in the Cable Act which leads us to believe that the Commission's decision to pre-empt local technical standards governing the quality of cable signals "is not one that Congress would have sanctioned." *Shimer*, 367

---

[5] Petitioners and other state and local authorities remain free, of course, to petition the Commission for an individualized waiver that would permit them to "impose additional or different requirements," which they may seek to obtain by demonstrating that particular local conditions create special problems that make the federal technical standards inadequate. See 47 CFR § 76.7 (1987).

U. S., at 383.[6]   We therefore affirm the judgment of the Court of Appeals.

It is so ordered.

---

[6] Since we conclude that the Commission is authorized under § 624(e) of the Cable Act to pre-empt technical standards imposed by state and local authorities, we need not also consider whether the Commission retains the same broad pre-emptive authority in the area of cable television under §§ 4(i) and 303 of the Communications Act of 1934, as amended, 47 U. S. C. §§ 154(i) and 303, that it had exercised before the Cable Act was enacted in 1984.   In adopting the regulations at issue here, the Commission claimed to possess statutory authority under those two sections of the Communications Act as well as under the new Cable Act.   50 Fed. Reg., at 52466. Petitioners claim that the Cable Act withdrew such authority from the Commission, and their claim draws some support from new language in 47 U. S. C. § 152(a) (1982 ed., Supp. IV), which states that "[t]he provisions of [the Communications Act] shall apply with respect to cable service . . . as provided in [the Cable Act]."   On the other hand, the House Report suggests that this language is merely a more explicit grant of "exclusive jurisdiction" to the Commission over specified aspects of cable service, see H. R. Rep. No. 98–934, pp. 95–96 (1984), which settles matters that had occasionally been in dispute.   In addition, § 303 of the Communications Act continues to give the Commission broad rulemaking power "as may be necessary to carry out the provisions of this chapter," 47 U. S. C. § 303(r), which includes the body of the Cable Act as one of its subchapters.   But since in any event the Commission possesses statutory authority to adopt the regulations at issue in this case under § 624(e) of the Cable Act, we do not decide whether the Commission's actions are authorized on this alternative basis as well.