**Douglas L. DICKS, Plaintiff,**

**v.**

**CAPITAL CITIES/ABC, INC., Defendant.**

**Civil Action No. C–1–95–765.**

United States District Court,
S.D. Ohio,
Western Division.

June 19, 1996.

Douglas L. Dicks, Cincinnati, OH, pro se.

Roger John Makley, Coolidge Wall Womsley & Lomb, Dayton, OH, for defendants.

### ORDER

HERMAN J. WEBER, District Judge.

This matter is before the Court upon the Report and Recommendation of the United States Magistrate Judge (doc. no. 10) and the parties' responses thereto (doc. nos. 11 and 12). The Magistrate Judge concluded that because plaintiff's emotional distress has, as its origins, the fear of a nonexistent physical peril, *Heiner v. Moretuzzo,* 73 Ohio St.3d 80; 87, 652 N.E.2d 664, 670 (1995), bars recovery no matter how much emotional trauma plaintiff may have suffered. The Magistrate Judge therefore recommended that defendant's Motion to Dismiss be granted and plaintiff's Complaint be dismissed with prejudice.

Plaintiff objects to the Judge's Report and Recommendation on the grounds that his findings are contrary to law.

Upon a *de novo* review of the record, especially in light of plaintiff's objections, the Court finds that plaintiff's contentions have either been adequately addressed and properly disposed of by the Judge or present no particularized arguments that warrant specific responses by this Court. The Court finds that the Judge has accurately set forth the controlling principles of law and properly applied them to the particular facts of this case and agrees with the Magistrate Judge that defendant's Motion to Dismiss should be granted.

Accordingly, the Court hereby **ADOPTS** the Report and Recommendation of the United States Magistrate Judge (doc. no. 10) and

defendant's Motion to Dismiss (doc. no. 6) is **GRANTED.** Plaintiff's Complaint is **DISMISSED WITH PREJUDICE** and this matter is **TERMINATED** on the docket of this Court.

IT IS SO ORDERED.

**REPORT AND RECOMMENDATION THAT:. (1) DEFENDANTS' MOTION TO DISMISS (DOC. 6) BE GRANTED; (2) PLAINTIFF'S COMPLAINT THEREFORE DISMISSED WITH PREJUDICE; AND (3) THIS CASE TERMINATED UPON THE DOCKET**

SHERMAN, United States Magistrate Judge.

### REPORT AND RECOMMENDATION

This case raises a novel issue of first impression: Can a supposedly violent television program, broadcast in Ohio and other states without a warning as to its content, cause an Ohio viewer to suffer emotional distress damages actionable, under that state's laws, as the negligent infliction of serious emotional distress? For the reasons that follow, the Court answers that question in the negative, and therefore recommends that defendants' motion to dismiss (doc. 6) be granted.

### I.

Plaintiff Douglas Dicks, who appears here *pro se,* claims in his handwritten complaint that, on May 3, 1994, he watched the American Broadcasting Company ("ABC") television program *Nightline,* hosted by Ted Koppel. The show broadcast that evening, "Rwanda: The New Killing Fields?," concerned the civil war then raging in that African country, and the resulting atrocities.[1] Plaintiff claims further that, "without offering a disclaimer or caution about the [show's] contents," *Nightline* proceeded to broadcast video footage of a Rwandan woman being murdered. Doc. 1 at 2. Specifically, the woman was, as plaintiff contends, "hacked to death and decapitated by two men." *Id.* The voice-over accompanying this footage— performed by a *Nightline* reporter—"very

---

1. For an overview of the Rwandan civil war, *see* Donatella Lorch, *Rwandan Refugees Describe Horrors after a Bloody Trek,* N.Y. Times, Apr. 25, 1994, at A1. A transcript of the subject *Nightline* broadcast is available on the LEXIS "news" library. *See* Rwanda: The New Killing Fields? (ABC television broadcast, May 3, 1994) (transcript number 3377).

explicitly described how she was kneeling in a pile of .death pleading for mercy." [2] *Id.* Immediately after watching this footage, plaintiff became "violently ill." *Id.* Since that time, he has suffered "emotional and physical problems" severe enough to warrant his consultation of a psychologist. *Id.* At the time of his September 1995 complaint filing, plaintiff was still under the psychologist's care. Seeking monetary damages, plaintiff has named both ABC—legally known as Capital Cities/ABC, Inc.—and Koppel as defendants.

## II.

In determining a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the factual allegations in the complaint must be taken as true, and construed in a light most favorable to plaintiff. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987). Denial of the motion is proper "unless it can be established beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Achterhof v. Selvaggio,* 886 F.2d 826, 831 (6th Cir.1989) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). *See also Broyde v. Gotham Tower, Inc.,* 13 F.3d 994, 996 (6th Cir.1994).

## III.

### A

Before proceeding to the merits of defendants' motion—argued on the basis that

**2.** The *Nightline* transcript reads in relevant part as follows:

> The exodus from Rwanda is so massive, so miserable, so murderous the United Nations has never recorded anything like it. . . .
>
> \*   \*   \*   \*   \*   \*
>
> This six-year-old boy and his thirteen-year-old sister are the only survivors of a family massacred at a Catholic church. The killers tried to cut the boy's head off with a machete.
> This woman stumbled and crawled for three days after she was badly beaten and her twelve-year-old daughter clubbed to death.
> A fourteen-year-old girl spends most of her time huddled under a blanket, refusing to eat. She saw her parents and six brothers and sisters killed.
>
> \*   \*   \*   \*   \*   \*

Tr. at 1–2. The transcript excerpt which plaintiff likely objects to is the following:

plaintiff fails to state a claim upon which relief can be granted—several procedural issues merit clarification.

First, after having liberally construed his *pro se* complaint, *see generally Williams v. Browman,* 981 F.2d 901, 903 (6th Cir.1992) (per curiam), the Court finds plaintiff complains, under the Court's diversity jurisdiction, of having suffered emotional distress damages actionable under state law.[3] As the parties are citizens of different states for purposes of 28 U.S.C. § 1332(a)(1), and also because more than $50,000.00 is at issue here, the elements of such jurisdiction are satisfied.

Second, because this is a diversity case, the Court, sitting as it does in Ohio, is bound to apply Ohio law. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). To that end, the Court must use, whenever possible, cases from the Ohio Supreme Court. *Angelotta v. American Broadcasting Corp.,* 820 F.2d 806, 807 (6th Cir.1987).

Third, the Ohio Supreme Court recognizes two types of emotional distress torts: the intentional infliction of emotional distress ("IIED"); and the negligent infliction of serious emotional distress ("NISED"). *See generally Yeager v. Local Union 20,* 6 Ohio St.3d 369, 453 N.E.2d 666 (1983) (IIED); *Paugh v. Hanks,* 6 Ohio St.3d 72, 451 N.E.2d 759

> Gangs of machete-swinging [ ]men went house to house, systematically hunting human prey. They dragged entire families from their homes. Neither women nor children were spared; killed by machete, by hammer, and bullet. This woman, trapped in a pile of death, pleaded for mercy from her attackers. None was given. . . .

*Id.* at 3.

**3.** Though therefore not at issue in this case, the Court notes in passing the recent debate as to whether film presentations and television broadcasts should be treated, for liability purposes, like other products entered into the stream of commerce in order to generate profit. *Cf.* Tony Allen–Mills, *Grisham Puts Hollywood on Trial for Murder,* Sunday Times (London), Apr. 7, 1996, at A3. Were such liability to attach, the producer, director and/or distributor of such material would be held responsible for the harm proximately caused by the viewing of their product.

(1983) (NISED). Although a cursory reading of plaintiff's complaint might lead to the conclusion that he seeks relief for both torts, plaintiff makes clear, in his response to defendants' motion, that he now complains only of the latter cause of action, *i.e.*, NISED. See doc. 8 at 2. Accordingly, the Court finds that: (1) it need just review the merits of plaintiff's NISED claim; and (2) to the extent that plaintiff plead an IIED claim in his complaint, that claim is voluntarily dismissed.

Finally, although plaintiff waited sixteen months after watching the *Nightline* broadcast to file his complaint, his NISED claim is not time-barred and may be reviewed on the merits, since Ohio provides a two-year limitations period for such claims. *Lawyers Coop. Publishing Co. v. Muething*, 65 Ohio St.3d 273, 280–81, 603 N.E.2d 969, 975 (1992) (interpreting Ohio Rev.Code § 2305.10). *See also Sutton v. Mt. Sinai Medical Ctr.*, 102 Ohio App.3d 641, 644, 657 N.E.2d 808, 810 (1995).

**B.**

The Court next turns to the merits of plaintiff's state-law NISED claim.

■ As a preliminary matter, the claim is likely preempted by federal law, since plaintiff, if successful on the merits of the claim, would effectively regulate what television transmissions are appropriately sent over Ohio's airwaves, an issue of federal concern. *Cf. Broyde, supra*, 13 F.3d at 997–98; *Still v. Michaels*, 791 F.Supp. 248 (D.Ariz.1992). The images shown on television programs such as *Nightline* are not a matter subject to resolution via state-law tort suits but, instead, by the Federal Communications Commissions ("FCC") pursuant to its enabling statute, the Federal Communications Act of 1934, 47 U.S.C. § 151 et seq., and the administrative regulations promulgated thereun-

der. *Still*, 791 F.Supp. at 251–52. *Accord City of New York v. FCC*, 486 U.S. 57, 63–66, 108 S.Ct. 1637, 1641–43, 100 L.Ed.2d 48 (1988). Such an analysis also makes sense from a policy point of view: were ABC, or any other television network, made subject to tort suits in each state where their programs are shown, the ability to broadcast uniform programming in all fifty states would surely be disrupted. Plaintiff's NISED claim can thus be dismissed on preemption grounds.

■ Assuming, *arguendo* and in the alternative, that plaintiff's NISED claim is not preempted by federal law, and that the Court need therefore reach the merits of the claim, defendants are correct that the claim is not actionable under Ohio law. As the Ohio Supreme Court recently made clear, a NISED plaintiff cannot recover "where the [emotional] distress [complained of] is caused by the plaintiff's fear of a nonexistent physical peril." *Heiner v. Moretuzzo*, 73 Ohio St.3d 80, 87, 652 N.E.2d 664, 670 (1995). To obtain relief under NISED, plaintiff must therefore have alleged in his complaint that he was "cognizant of a real danger to [himself] or another," and "either witnessed or experienced a dangerous accident or appreciated [ ]actual physical peril." *Id.*, 73 Ohio St.3d at 86–87, 652 N.E.2d at 669–70. Here, in contrast, plaintiff complains of emotional distress caused by watching television, and neither witnessing, experiencing nor appreciating a "live, in person" event. In other words, while the real physical peril was occurring in Africa, plaintiff was many thousands of miles away, in the midwestern United States. Because plaintiff's emotional distress thus has, as its origins, the fear of a nonexistent physical peril, *Heiner* bars his recovery, no matter how much emotional trauma the *Nightline* episode made him suffer.[4]

---

4. In so ruling, the Court does not seek to minimize the emotional discomfort and/or trauma plaintiff may well have suffered when unexpectedly viewing an actual murder on television. *Compare Heiner*, 73 Ohio St.3d at 88, 652 N.E.2d at 670 ("[though we find plaintiff fails to state a NISED claim,] we have no doubt that the emotional injuries suffered by [him] were real and debilitating"). This conclusion is borne out by psychological research, which demonstrates that such exposure can have a significant, lasting

impact. *Alliance for Community Media v. FCC*, 56 F.3d 105, 149 n. 1 (D.C.Cir.1995) (en banc) (Edwards, C.J., dissenting).

Anticipating such an argument, defendants contend in their motion papers that plaintiff voluntarily exposed himself to the *Nightline* broadcast, and could have turned it off at any time. But this begs the question. The Court doubts that, in electing to watch a regularly scheduled, highly respected news broadcast, plaintiff some-

## IV.

The Court therefore **RECOMMENDS** that defendants' motion to dismiss be **GRANTED,** plaintiff's complaint **DISMISSED WITH PREJUDICE,** and this case **TERMINATED UPON THE DOCKET.**

Date: <u>May 13, 1996</u>

how consented to watch a murder in all its grisly detail. And, if plaintiff's claims are to be believed, *Nightline* was broadcast without an adequate warning, which would have provided him an opportunity to either turn off the program, or avert his glance. (A reading of the *Nightline* transcript bears out that such a warning was, in fact, never provided.)

Defendants suggest further that the title of the May 3rd program—"Rwanda: The New Killing Fields?"—was a sufficient warning, in and of itself. The Court questions that assumption, and also wonders what practical impact such an unrepeated "warning" provided to the many who turned in to *Nightline* just a few seconds after the program began. While beyond the scope of this case, these are issues of societal concern which merit serious and continued contemplation. *Accord id.* at 149.