Filed 2/23/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| SHERRY FISCHER et al., | B254863 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC512259) |
| v. | |
| TIME WARNER CABLE INC. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Lee Smalley Edmon, Judge; Amy D. Hogue, Judge. Affirmed.

Blecher Collins Pepperman & Joye, Maxwell M. Blecher and Courtney A. Palko, for Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, Daniel G. Swanson, Jay P. Srinivasan and Brandon J. Stoker for Defendant and Respondent Time Warner Cable, Inc.

White & Case, Bryan A. Merryman, Rachel J. Feldman and Lauren M. Mutch for Defendant and Respondent The Los Angeles Lakers, Inc.

Winston & Strawn, David B. Enzminger, Dan K. Webb, Derek J. Sarafa and William C. O'Neil for Defendants and Respondents Los Angeles Dodgers Holding Company and America Media Productions.

_____

Four subscribers to Time Warner Cable appeal from the order sustaining without leave to amend the demurrers of Time Warner, the Los Angeles Lakers and the Los Angeles Dodgers to the subscribers' class action unfair competition complaint based on rate hikes for carrying channels that broadcast Dodgers and Lakers games. We affirm because federal regulations implementing federal communications statutes have expressly preempted this action.

## FACTS AND PROCEDURAL HISTORY[1]

Time Warner Cable is a significant, if not the primary, provider of cable television throughout several Southern California counties. Typically, Time Warner buys content from programmers (think Fox, Disney, Viacom, and HBO), who require Time Warner to offer each programmer's channels in a single bundle as part of Time Warner's enhanced basic cable programming tier.

In 2011, Time Warner paid the Lakers $3 billion for the licensing rights to televise Lakers games for 20 years over two channels: TWC SportsNet and TWC Deportes. Time Warner's subscription rates rose by $5 a month as result of bundling those channels into the enhanced basic cable tier. In 2013, Time Warner paid the Dodgers $8 billion for the licensing rights to televise Dodgers games for 25 years. The new SportsNet LA channel was also added to the enhanced basic cable tier, raising subscribers' monthly rates by another $4. The rate hikes will cost Time Warner subscribers at least $11 billion over the life of the contracts.

Sherry Fischer, Stewart R. Graham, Todd Crow, and Gavin McKiernan filed a class action lawsuit against Time Warner, the Dodgers, and the Lakers, alleging that this new arrangement violated the state's unfair competition law (UCL) (Bus. & Prof. Code, § 17200, et seq.) because: (1) Time Warner's acquisition of the licensing rights to

---

[1] Under the standard of review applicable to demurrers, which we discuss *post*, our recitation of the facts is based on the allegations of the complaint, which we accept as true.

2

Dodgers and Lakers games made it both programmer and distributor; (2) surveys showed that more than 60 percent of the population does not follow sports and would not pay separately to watch Dodgers or Lakers games; (3) there were no valid reasons for bundling these sports stations into the enhanced basic cable tier instead of offering them separately as part of a sports channel package;[2] (4) although a majority of Time Warner subscribers would opt out of those channels if they could, they had no such option and were instead forced to pay an extra $9 per month for unwanted programming; (5) Time Warner expanded the reach of this scheme by selling its rights to Lakers and Dodgers games to other cable and satellite television providers, requiring those providers to also include those channels as part of their enhanced basic tiers; and (6) the Lakers and Dodgers knew the increased costs would be passed on to unwilling subscribers and were the intended beneficiaries of these arrangements.[3]

Time Warner demurred to the complaint on the ground that federal law expressly permitted bundling of channels, thereby providing a "safe harbor" against unfair competition claims. The Dodgers and Lakers filed separate concurrent demurrers, with both contending they could not be liable because they had not committed unfair acts, while the Lakers also joined in Time Warner's demurrer.[4] The trial court sustained

---

[2]     By federal statute, which we detail in section 2 of our Discussion, cable service is divided into three parts: (1) a basic service tier of local commercial stations and public access channels that may be supplemented with additional cable channels; (2) cable programming services offered in tiers or groups, for which a separate rate is charged; and (3) video programming offered on a per-channel or per-program basis. (*Time Warner Entertainment Co., L.P. v. F.C.C.* (D.C. Cir. 1995) 56 F.3d 151, 180 (*Time Warner*), & fns. (4)-(6) (dis. opn. of Randolph, J.); 47 U.S.C. §§ 522(3), (17); 543(a)(2), (b)(7)(A)-(B), (c)(1), (c)(2)(D), (l)(2).) Time Warner's cable lineup, which the trial court judicially noticed, lists the three disputed sports channels as part of its basic lineup. We assume that the reference in the complaint to an "enhanced basic tier" means that Time Warner added those and other channels to its basic service tier, as allowed by the Cable Act.

[3]     We will refer to the four individual plaintiffs collectively as appellants. We will sometimes refer to Time Warner, the Dodgers and Lakers collectively as respondents.

[4]     The parties raised other issues in their demurrers that are not relevant on appeal.

3

without leave to amend Time Warner's demurrer on the safe harbor ground, adding to its analysis a legal issue that had not previously been raised:  the express preemption of state unfair competition laws by a federal regulation implementing federal statutes that govern the cable television industry.  (47 C.F.R. § 76.981(c).)  The trial court sustained without leave to amend the Lakers' and Dodgers' demurrers because the absence of a claim against Time Warner meant there could be no claim as to them.  The trial court then entered judgment for respondents.

## STANDARD OF REVIEW

In reviewing a judgment of dismissal after a demurrer is sustained without leave to amend, we assume the truth of all properly pleaded facts.  We examine the complaint's factual allegations to determine whether they state a cause of action on any available legal theory regardless of the label attached to a cause of action.  (*Doe v. Doe 1* (2012) 208 Cal.App.4th 1185, 1188.)  We do not assume the truth of contentions, deductions, or conclusions of fact or law, and may disregard allegations that are contrary to the law or to a fact that may be judicially noticed.  A demurrer is proper when a ground for objection to the complaint appears on its face or from matters of which the court may or must take judicial notice.  (*Id.* at pp. 1188-1189.)  To the extent statutory construction issues are raised we apply the rules of statutory construction and exercise our independent judgment as to whether the complaint states a cause of action.  (*Id.* at p. 1189.)

We will affirm an order sustaining a demurrer on any proper legal ground whether or not the trial court relied on that theory or it was raised by the defendant.  (*Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1490-1491; *Henry v. Associated Indemnity Corp.* (1990) 217 Cal.App.3d 1405, 1413, fn. 8.)[5]

Finally, whether leave to amend should have been granted is reviewed under the abuse of discretion standard, although error is shown if there is any reasonable

[5]     Perhaps in recognition of this rule, appellants do not contend that we may not consider the express regulatory preemption issue that was first raised by the trial court.

4

probability an amendment that cures the defect can be made.  Appellants bear the burden on appeal of showing a reasonable possibility exists that the complaint can be successfully amended.  (*Rosen v. St. Joseph Hospital of Orange County* (2011) 193 Cal.App.4th 453, 458.)

## DISCUSSION

*1.        Regulations of a Federal Agency May Preempt State Law*

Under the Supremacy Clause of the United States Constitution (Art. VI, cl. 2), federal law "shall be the supreme Law of the Land."  (*Brown v. Mortensen* (2011) 51 Cal.4th 1052, 1059 (*Brown*).)  Therefore Congress may preempt state laws to the extent it believes such action is necessary to achieve its purposes.  (*City of New York v. FCC* (1988) 486 U.S. 57, 63 (*City of New York*).)

Congress may exercise that power expressly, or the courts may infer preemption under one of three implied preemption doctrines:  conflict, obstacle, or field preemption.  (*Brown, supra*, 51 Cal.4th at p. 1059.)  Express preemption occurs when Congress defines the extent to which a statute preempts state law.  (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935.)  Conflict preemption exists when it is impossible to simultaneously comply with both state and federal law.  (*Ibid.*)  Obstacle preemption occurs when state law stands in the way of full accomplishment and execution of federal law.  (*Ibid.*)  Field preemption applies when comprehensive federal regulations leave no room for state regulation.  (*Ibid.*)

Preemption may be based either on federal statutes or on federal regulations that are properly adopted in accordance with statutory authorization.  As a result, a federal agency acting within the scope of its congressionally delegated authority may preempt state regulation and "render unenforceable state or local laws that are otherwise not inconsistent with federal law."  (*City of New York, supra*, 486 U.S. at p. 64, citation

5

omitted.) The current appeal presents primarily the question of regulatory, not statutory, preemption.

When regulatory preemption is at issue, the regulation's force does not depend on express congressional authorization to displace state law. As a result, a narrow focus on Congress's intent to supersede state law is not appropriate. (*City of New York, supra*, 486 U.S. at p. 64.) Therefore the focus is on the agency and whether it acted within the bounds of its lawful authority. (*Ibid.*)

A federal agency's regulations will preempt any state or local laws that conflict with or frustrate the regulations' purpose. Beyond that, in proper circumstances an agency may determine that its authority is exclusive and preempts any state efforts to regulate at all in the forbidden area. (*City of New York, supra*, 486 U.S. at p. 64.) Many of the responsibilities conferred on federal agencies include a broad grant of authority to reconcile conflicting policies. "Where this is true, the [Supreme] Court has cautioned that even in the area of pre-emption, if the agency's choice to pre-empt represents a reasonable accommodation of conflicting policies that were committed to the agency's care by statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one Congress would have sanctioned." (*Ibid.,* internal citations and quotation marks omitted.)

2. *Applicable Federal Statutes and Regulations in the Cable Industry*

The Federal Communication Commission regulates cable television service through the Cable Television Consumer Protection and Competition Act of 1992. (47 U.S.C. § 521 et seq., the Cable Act.)[6] Section 543 of the Cable Act governs the regulation of rates and provides that, with certain exceptions, no federal agency or state

---

[6] All further section references are to section 47 of the United States Code.

may regulate rates. (§ 543(a)(1).)[7] Section 543 of the Cable Act also prohibits cable operators from engaging in "negative option billing," such that subscribers may not be charged "for any service or equipment that the subscriber has not affirmatively requested by name." (§ 543(8)(f).)[8] This section prohibits cable companies from providing a service the customer has not expressly requested and then charging for the service if the customer fails to exercise the negative option of cancelling the subscription or opting out of the service. (*Belton v. Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4th 1224, 1236.) The statute reinforces the prohibition against negative option billing by providing that "a subscriber's failure to refuse a cable operator's proposal to provide such service or

---

[7] When a cable provider is subject to "effective competition," its rates are unregulated. (§ 543(a)(1), (2).) Section 543 establishes three separate market share formulas to determine whether effective competition exists. (§ 543(*l*)(1); *Time Warner, supra*, 56 F.3d at p. 162.) If a cable provider is not subject to effective competition then the FCC regulates its rates according to a complex set of statutory and regulatory standards. (*Time Warner*, at pp. 162-163; § 543(c)(2); 47 C.F.R. § 76.922.)

The parties do not specifically address whether Time Warner is subject to effective competition and therefore exempt from rate regulation. However, while the complaint alleges that Time Warner is either a significant or primary cable provider in the affected areas, it also alleges the existence of alternate providers and does not state that Time Warner is not subject to effective competition. In its trial court points and authorities, Time Warner cited section 543(a) for the proposition that it had "complete discretion" to set its own rates, while appellants said they were not asking the court to regulate rates and instead wanted them determined by "market forces." We take from this that Time Warner is subject to effective competition under the Cable Act and that its rates are therefore unregulated, a fact that appellants' counsel confirmed during oral argument.

[8] Section 543(8)(f) states: "A cable operator shall not charge a subscriber for any service or equipment that the subscriber has not affirmatively requested by name. For purposes of this subsection, a subscriber's failure to refuse a cable operator's proposal to provide such service or equipment shall not be deemed to be an affirmative request for such service or equipment."

7

equipment shall not be deemed to be an affirmative request for such service or equipment." (§ 543(8)(f).)[9]

Pursuant to its regulatory authority, the FCC promulgated 47 C.F.R. section 76.981 implementing section 543's prohibition against negative option billing, but carved out an exception.[10] Negative option billing does not include "the addition or deletion of a specific program from a service offering, the addition or deletion of specific channels from an existing tier or service, the restructuring or division of existing tiers of service, or the adjustment of rates as a result of the addition, deletion or substitution of channels . . . ." (47 C.F.R. § 76.981(b).)[11] Under the circumstances just described, negative option billing is permitted. The Regulations also provide that state and local governments may not enforce consumer protections laws that conflict with this exception to the negative option billing prohibition so long as the changes proposed by the cable

---

[9] The manner in which Time Warner effected its decision to add unilaterally the Dodgers and Lakers channels is an example of negative option billing as subscribers were not asked to affirmatively request or agree to the additional channels.

[10] The regulation states: "(a) A cable operator shall not charge a subscriber for any service or equipment that the subscriber has not affirmatively requested by name. A subscriber's failure to refuse a cable operator's proposal to provide such service or equipment is not an affirmative request for service or equipment. A subscriber's affirmative request for service or equipment may be made orally or in writing.

"(b) The requirements of paragraph (a) of this section shall not preclude the adjustment of rates to reflect inflation, cost of living and other external costs, the addition or deletion of a specific program from a service offering, the addition or deletion of specific channels from an existing tier or service, or the adjustment of rates as a result of the addition, deletion or substitution of channels pursuant to § 76.922, provided that such changes do not constitute a fundamental change in the nature of an existing service or tier of service and are otherwise consistent with applicable regulations.

"(c) State and local governments may not enforce state and local consumer protection laws that conflict with or undermine paragraph (a) or (b) of this section or any other sections of this Subpart that were established pursuant to Section 3 of the 1992 Cable Act, 47 U.S.C. 543."

[11] All further references to "Regulations" are to Title 47 of the Code of Federal Regulations.

operator "do not constitute a fundamental change in the nature of an existing service or tier of service and are otherwise consistent with applicable [FCC] regulations." (Regulation, § 76.981(b), (c).)[12]

In sum, changes to a service tier that *do not* amount to a fundamental change in the nature of service do not run afoul of the negative option billing prohibition, meaning that such changes can be made without a subscriber's express advance agreement. Particularly relevant to this case, state and consumer protection laws are preempted to the extent they target such nonfundamental changes.[13]

The question remains: Was the inclusion of the three sport channels to the basic tier (1) simply the addition of "specific" programs or channels and hence a form of negative option billing that is lawful under the regulations or (2) a fundamental change in the nature of an existing service or tier and hence subject to state consumer protective laws?

3.  *Regulation Section 76.981 Preempts the UCL*

The trial court concluded, and respondents contend here, that Time Warner did nothing more than add three sports channels to its enhanced basic service tier and adjust subscribers' rates accordingly, changes that did not fundamentally alter the nature of the existing tier. As a result, respondents contend that appellants' UCL action is expressly

---

[12]   The Cable Act itself contains several statutes relating to preemption. Section 556, subdivision (c) provides generally that any provision of state law "which is inconsistent with this chapter shall be deemed to be preempted and superseded." Section 552, subdivision (d)(1), states, "Nothing in this subchapter shall be construed to prohibit any State or any franchising authority from enacting or enforcing any consumer protection law, to the extent not specifically preempted by this subchapter." (See also § 552, subds. (a), (b); § 557.)

[13]   Regulation section 76.981, subdivision (c) provides: "State and local governments may not enforce state and local consumer protection laws that conflict with or undermine paragraph (a) [negative option billing] or (b) [limiting the prohibition against negative option to 'fundamental' changes] of this section or any other sections of this Subpart that were established pursuant to Section 3 of the 1992 Cable Act, 47 U.S.C. 543."

preempted by Regulation section 76.981, which authorizes such minor channel lineup changes (Regulation §76.981(b)), exempts them from the negative option billing prohibition (Regulation §76.981(a)), and expressly preempts state consumer protection laws that "conflict with or undermine" the negative option billing/fundamental change regulation (Regulation §76.981(c)).

Appellants contend that Regulation section 76.981 does not apply because: (1) Time Warner's unilateral addition of new channels at a higher rate was a negative option billing practice prohibited by section 543, subdivision (8)(f); (2) the new channels fundamentally changed an existing tier of channels under Regulation 76.981, subdivision (b); (3) section 552(d)(1) of the Cable Act permits enforcement of state consumer protection laws unless the Cable Act expressly states otherwise; and (4) section 543 of the Cable Act does not provide for such preemption in this setting. We disagree.

The only court to construe Regulation section 76.891, determine the FCC's authority to promulgate it, and consider the regulation's preemptive effect, is *Time Warner Cable v. Doyle* (7th Cir. 1995) 66 F.3d 867 (*Doyle*).[14]

The *Doyle* court considered an unfair trade practices action brought by the State of Wisconsin against Time Warner for claimed negative option billing practices. Time Warner deleted certain channels from its basic and standard service tiers and began offering them on an "a la carte" or per channel basis. This resulted in a rate decrease for the two existing tiers, coupled with a new charge for the a la carte channels. As a result, those who had already subscribed to both tiers saw no net increase in their monthly bills because the combined effect of the simultaneous rate increases and decreases balanced each other out. Time Warner did not ask its *existing* subscribers whether they wished to receive the a la carte channels and began billing for them. New subscribers were given

---

[14] The court in *Time Warner, supra*, 56 F.3d 151, considered a challenge by cable operators to FCC rulemaking opinions that heralded the FCC's interpretation of section 543(c)'s negative option billing provision to permit concurrent enforcement of state consumer protection laws unless they impinged on rate regulation. Regulation section 76.981 was never mentioned and the *Time Warner* court held that the issue was not yet ripe for judicial review. (*Id.* at pp. 194-195.)

10

an affirmative choice whether to receive the a la carte channels. Presumably, subscribers who opted out of the a la carte channels would have the cost of their cable service reduced.

The district court entered summary judgment for the state. The Seventh Circuit reversed, finding the action was preempted by Regulation section 76.981. The *Doyle* court began by noting the rule that when a statute is silent or ambiguous on the issue of preemption, the courts must defer to an interpretation by the administering agency so long as it is based on a permissible reading of the statute. (*Doyle, supra*, 66 F.3d at p. 876.) The negative option billing provision of section 543 was ambiguous because its language standing alone did not "answer the question of whether the unbundling or the mere relabeling of existing services" was sufficient to require affirmative customer consent. (*Id.* at p. 877.)

The appellate court also observed that a literal interpretation of the "negative option billing" prohibition in section 543(8)(f) would impose the burdensome requirement of cable operators obtaining affirmative customer consent every time a station was substituted, "producing significant compliance costs that would be difficult to reconcile with the contemplated rate regulation scheme." (*Doyle, supra*, 66 F.3d at p. 877.)[15] Because section 543(8)(f)'s negative option billing prohibition was placed in the Cable Act's rate regulation section, not the consumer protection section (§ 552), an inference arose that the requirement of an affirmative request for service was at least a factor in the regulatory scheme for rates, and was therefore subject to the bar on rate regulation under section 543(a)(1). (*Ibid.*)

---

**15** In the context of the present case, if negative option billing were prohibited in every situation, Time Warner would not be able to delete, for example, the Velocity Channel (channel 416) or the Oxygen Channel (channel 77) from its basic cable lineup without affirmative agreement by subscribers to continue basic cable service without those channels. Regulation 76.981(b) permits the cable operator to take such action without affirmative subscriber agreement because the deletion of the channels does not constitute a "fundamental change."

11

The Seventh Circuit observed that section 552 permits the enforcement of state consumer protection laws absent their express preemption by the Cable Act.[16] But the court held that the FCC had reasonably interpreted section 543(8)(f) to preempt state challenges to negative option billing practices that did not fundamentally alter a service tier, as expressly permitted by Regulation section 76.981. (*Doyle, supra*, 66 F.3d at pp. 878-879.) Although that choice was made clear by the current version of Regulation section 76.981, the *Doyle* court examined a previous version of that regulation that had been in effect when Time Warner first implemented the tier restructuring. According to the *Doyle* court, a series of FCC reports showed an evolving awareness that Regulation section 76.981 was always intended to have preemptive effect where state consumer protection laws impinged on rate regulations. (*Id.* at pp. 878-881.) The *Doyle* court acknowledged that there was long-standing tension between two policy concerns— federal control of matters that affect cable rates and state freedom to enforce consumer protection laws. It concluded that the FCC has consistently reconciled this tension by opting to protect the rate structure whenever it is jeopardized by state consumer protection laws. (*Id.* at p. 881.)

In short, the Seventh Circuit concluded that, while state consumer protection laws may be enforced generally under the Cable Act, where enforcement is sought in regard to negative option billing practices that concern non-fundamental service changes, they are preempted by Regulation section 76.981. (*Doyle, supra*, 66 F.3d at pp. 880-881.)

---

[16] The version of section 552(d)(1) printed in the United States Code Annotated states that the statute's express endorsement of the companion use of state consumer protection laws unless otherwise preempted states that "[n]othing in this subchapter" prevents their enforcement. Based on this, respondents contend that the provision authorizing state consumer actions does not apply to negative option billing practices under section 543(8)(f) because that statute is found in another *subchapter* of the Cable Act. The *Doyle* court clarified that the use of "subchapter" was essentially a typographical error because the Statutes at Large (106 Stat. 1484) uses the word "title" instead of subchapter, a conflict that is generally resolved in favor of the language used in the Statutes at Large. (*Doyle, supra*, 66 F.3d at p. 878, & fn. 11.) As a result, consumer protection in section 552(d)(1) (formerly found in subdivision (c)), applies to the general provisions of the Cable Act as a whole. (*Id.* at pp. 878 & fn. 11, pp. 881-882.)

Another factor the *Doyle* court considered was the potential remedy of disgorgement available under Wisconsin's unfair trade practices act. Even though the parties later stipulated that disgorgement would not be sought, the Seventh Circuit held that the . . . initial availability of that remedy impacted rate regulation because, were disgorgement ordered, the net effect would be that Time Warner would have provided the disputed channels for free. (*Doyle, supra*, 66 F.3d at pp. 881-882.) As a result, enforcement of that state law would have "impact on the rate rules by discouraging the provision of new services at a reasonable cost." (*Id.* at p. 882.) Accordingly, Regulation section 76.981 was a proper interpretation of section 543's ban on state regulation of rates, and therefore preempted Wisconsin's attempt to enforce its consumer protection law. (*Ibid.*)

With *Doyle* as a guide, we conclude that Regulation section 76.981 is a proper exercise of the FCC's regulatory authority and preempts appellants' UCL claim. First, as in *Doyle*, appellants seek restitution of the rate hike fees, thereby retroactively affecting rates Time Warner has already charged its customers. Second, the trial court took judicial notice of the channel lineups as they stood before and after the new sports channels were added. Only three of nearly 100 in the non-broadcast basic cable tier were affected. An FCC order interpreting Regulation section 76.981 states that tier changes of that nature are minor, not "fundamental," even if they are accompanied by a rate adjustment, and are therefore within the preemptive scope of Regulation section 76.981, subd. (c). (*Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992; Rate Regulation, Sixth Order on Reconsideration,* 10 F.C.C.R. 1226, ¶¶ 109-100, adopted Nov. 10, 1994, released Nov. 18, 1994 (FCC Sixth Order).) By contrast, deleting all existing channels from a particular tier and replacing them with an entirely new set of channels would constitute a fundamental change to a tier of channels. (*Id.* at ¶ 110.) In that hypothetical setting, negative option billing would be implicated and state laws that addressed such changes would not be preempted.

Appellants challenge *Doyle* by citing to the *Doyle* dissent's contention that section 543 was not ambiguous and therefore did not support the FCC's interpretation and

concomitant enactment of Regulation section 76.981. Of course, a dissent has no precedential value, and we find it unpersuasive here. (*Tearlach Resources Limited v. Western States Internat., Inc.* (2013) 219 Cal.App.4th 773, 783.) We agree with the *Doyle* court that literal application of negative option billing to every minor change would be seriously burdensome to cable operators, and it was that reality that prompted the FCC to add the "fundamental change" rule to negative option billing in Regulation section 76.981. (*Doyle, supra*, 66 F.3d at p. 877.) Thus, the regulation was compatible, not inconsistent, with section 543, and hence a proper subject for regulatory promulgation and regulatory preemption. (*City of New York, supra*, 486 U.S. at pp. 63-64, citation omitted.)

Appellants also contend that the FCC Sixth Order actually supports their contention that Time Warner's addition of the three sports channels constituted a fundamental change to the basic service tier that brought it outside the preemptive effect of Regulation section 76.891. Because the FCC Sixth Order provides a 20 cents per channel cap on the costs of adding new channels, appellants contend that the $9 per month rate hike for the three new channels did constitute a fundamental change. However, as Time Warner points out, that 20 cent cap was aimed at the "costs of adding a channel" and did not apply to programming costs, which is "the costs of obtaining programming." Plaintiffs effectively alleged that the rate hikes represent Time Warner's costs of obtaining the programming, meaning that the 20 cent cap does not apply. Furthermore, that price cap was, by its terms, in place only through 1997. (FCC Sixth Order, ¶¶ 8, 9, 66, 72-73, 76.) Therefore, all that remains of the FCC Sixth Order relevant to negative option billing is its statement that state consumer protection laws are preempted in regard to non-fundamental channel additions and concomitant rate hikes. (*Id.* at ¶ 13.)[17]

Appellants also rely on decisions that have allowed enforcement of various state laws against cable operators, but none is applicable. (*Total TV v. Palmer*

---

[17] We asked for and received supplemental briefing from the parties on this issue.

14

*Communications, Inc.* (9th Cir. 1995) 69 F.3d 298 [action under the Unfair Practices Act (Bus. & Prof. Code, § 17204) by one cable operator against another alleging predatory pricing designed to drive it out of business; no mention of Regulation section 76.981]; *Cable Television Ass'n v. Finneran* (2d Cir. 1992) 954 F.2d 91 [New York state law prohibiting cable operators from charging subscribers a $40-$100 fee to downgrade to less expensive service not preempted by section 543 prohibition against state regulation of rates because the downgrade fee was not a rate; no mention of Regulation section 76.981]; *Morrison v. Viacom, Inc.* (1997) 52 Cal.App.4th 1514, 1529-1531 [class action by cable subscribers alleging that cable operator violated state antitrust law by "tying" purchase of one service to purchase of other service not preempted because it only *indirectly* affected rates; distinguished *Doyle* because *Doyle* concerned "a much different situation" of "'minor adjustments in programming'" and because the FCC had not preempted state law that only indirectly affects rates].)

In short, the FCC, pursuant to its statutory authority, has made it clear that state consumer protection laws are preempted in regard to negative option billing practices that result in rate hikes due to the addition of a small number of channels because those rate hikes do not represent a "fundamental change" in service. The essence of appellants' complaint is to the contrary—nonfundamental changes are not preempted. Even though they seek leave to amend to allege that the three channel additions fundamentally altered the basic cable tier, such an allegation would not eliminate that defect, as the cited authorities indicate that such additions are not fundamental changes. We therefore hold that the action is necessarily preempted as to all respondents.[18]

---

[18] We do so keenly aware of how this issue affects millions of our fellow Southern California residents. With apologies to Bruce Springsteen, we appreciate the lament of cable television subscribers who feel that although they now receive 10 times 57 channels or more, mostly nothing's on that they wish to view. We simply hold that federal preemption principles bar application of state consumer protection laws in this case. Thus, consumers must present their complaints to Congress or the FCC.

**DISPOSITION**

The judgment of dismissal based on the order sustaining respondents' demurrers without leave to amend is affirmed. Respondents to recover their appellate costs.

RUBIN, ACTING P. J.

WE CONCUR:

FLIER, J.

GRIMES, J.

16