# The Federalism Accountability Act

Provisions of the proposed Federalism Accountability Act that would alter the rules under which courts determine whether Congress has preempted state law by statute or authorized preemption by regulation could have far reaching and unintended consequences and should only be enacted if Congress determines that existing preemption doctrine has systematically frustrated congressional intent and that statutory rules of construction would produce better results.

Provisions of the bill that would instruct courts to resolve ambiguities in federal law in favor of preserving the authority of the states could frustrate the intentions of Congress and rulemaking agencies and should not be enacted

July 14, 1999

## STATEMENT BEFORE THE COMMITTEE ON GOVERNMENTAL AFFAIRS
## UNITED STATES SENATE

I am honored to be here today to testify regarding S. 1214, the Federalism Accountability Act of 1999. Mr. Spotila, representing the Office of Information and Regulatory Affairs of the Office of Management and Budget, has discussed the Administration's concerns with section 7 of the bill, which would require Federal agencies to prepare and publish federalism assessments for certain Federal rules. My remarks will focus on section 6, which would establish rules of construction relating to statutory and regulatory preemption.

Section 6 would establish new rules of construction relating to Federal preemption of State law. Sections 6(a) and 6(b) would alter the rules under which courts currently determine whether Congress has preempted State law by statute or authorized preemption of State law by regulation. Section 6(c) would operate more broadly, requiring that any ambiguity in the Federalism Accountability Act or in any other Federal law be construed in favor of preserving the authority of the States and the people. Although we are still evaluating the potential implications of these provisions, we believe that each raises questions that warrant careful consideration.

Under current Supreme Court doctrine, the preemptive force of a Federal statute is determined by examining Congress's intentions with respect to preemption.[1] Congressional intent to preempt can be stated explicitly, in the terms of a statutory provision addressing preemption. This is commonly referred to as "express preemption." In addition, congressional intent can also be conveyed implicitly, through the establishment of Federal law that conflicts with State law, commonly known as "conflict preemption," or that occupies an entire field and leaves no room for State lawmaking, commonly known as "field preemption." Conflict preemption occurs where Federal law and State law are in direct conflict or where

---

[1] For a general summary of Supreme Court doctrine concerning the preemption of State law by Federal statutes, see *English v General Elec. Co.*, 496 U S 72, 79 (1990) *Accord Boggs v. Boggs*, 520 U S. 833, 839–41 (1997)

State law stands as an obstacle to the achievement of Federal objectives. Field preemption occurs where the creation of a pervasive system of Federal regulation makes it reasonable to infer that Congress intended to disallow supplemental State law measures or where Congress legislates in an area where the Federal interest is so dominant that a Federal system can be presumed to displace State laws on the same subject. The doctrine of field preemption has formed the basis for Federal preemption of State law in a number of important areas, including nuclear safety, collective bargaining, and alien registration.[2]

Section 6(a) would change the rules under which courts and agencies infer congressional intent to preempt by statute. Under section 6(a), no Federal statute enacted after the effective date of the Federalism Accountability Act would pre-empt State law unless the statute contained an express statement of Congress's intent to preempt or there was a "direct conflict" between the Federal statute and State law so that the two could not "be reconciled or consistently stand together." This provision would profoundly alter the Federal courts' longstanding approach to preemption by Federal statute. It would apparently abolish the doctrine of field preemption and impose significant new limits on conflict preemption.[3]

The findings section of the Act notes that this change is made necessary by Federal court preemption rulings that have applied current doctrine to produce results "contrary to or beyond the intent of Congress." S. 1214, § 2(5). It is not clear, however, which applications of existing preemption doctrine are viewed as having misinterpreted the intent of Congress. Our review indicates that Federal court decisions involving field preemption and conflict preemption generally have demonstrated a strong commitment to the avoidance of preemption that is not necessary to the achievement of clear statutory objectives. The Supreme Court has determined, for example, that Federal law occupies the field of nuclear safety regulation, but does not preempt State regulation of nuclear utilities that does not bear directly on safety; and that the National Labor Relations Act occupies the field of collective bargaining, but not the field of labor relations in general.[4]

In addition, under both conflict and field preemption doctrines, the burden that must be borne by the proponent of preemption varies with the setting. In areas of traditional State primacy, the courts require a heightened showing of congressional intent to preempt. Indeed, the Supreme Court has stated that "[w]hen Congress legislates in a field traditionally occupied by the States, 'we start with the

---

[2] *See Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S 190, 212–13 (1983) (nuclear safety), *Metropolitan Life Ins. Co. v Massachusetts*, 471 U.S. 724, 750–51 (1985) (collective bargaining); *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (registration of aliens).

[3] The Supreme Court has stated that conflict preemption and field preemption should not be viewed as "rigidly distinct" categories and has suggested that "field preemption may be understood as a species of conflict preemption," since State law operating within a preempted field can be seen to conflict with Congress's intent to exclude State regulation. *English v. General Elec*, 496 U S at 79 n 5 Section 6(a) of S 1214, by confining implied preemption to situations involving "a direct conflict" between irreconcilable or inconsistent directives, would appear to foreclose recognition of field preemption as a subclass of conflict preemption for purposes of section 6 of the bill.

[4] *See Pacific Gas & Elec.*, 461 U S at 212–13 (limited preemption respecting nuclear safety); *Metropolitan Life*, 471 U S. at 750–51 (limited preemption respecting collective bargaining)

assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' ''[5]

More importantly, it seems far from clear that increased reliance on express preemption provisions in Federal statutes will produce better results. It can be extremely difficult to craft express preemption provisions that produce the desired balance between Federal and State authority. Detailed express preemption provisions may be prone to overinclusiveness, displacing State law where such displacement is not truly necessary, or underinclusiveness, undermining the effectiveness of Federal law by failing to displace antithetical State law. Moreover, the problems with such express preemption provisions are likely to be most acute where the stakes are highest — that is, where Congress enacts legislation that applies broadly and over a long period of time. Indeed, some of the harshest criticism of Federal preemption has focused on perceived excesses of preemption under express statutory provisions contained in such legislation. One noteworthy example is section 514(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1144(a) (1994). That provision, which expressly preempts most State laws that "relate to" employee benefit plans covered by ERISA, has been criticized for cutting too wide a swath through State law governing employee benefit plans.[6]

It is also important to note that enactment of S. 1214 would not prevent a later Congress from instructing that the preemptive effects of a particular statute should be determined, notwithstanding section 6(a), by reference to traditional implied preemption doctrines. Indeed, one significant set of interpretive problems that would likely arise in the implementation of this provision — and of the other rules of construction found in section 6 — would involve disputes as to whether Congress implicitly intended to exempt particular statutes from section 6 of the Federalism Accountability Act. For example, if a subsequent Congress enacted a law that established a pervasive Federal regulatory regime and that demonstrated a clear, though not express, intention to preempt, courts might well conclude that the later enactment implicitly repealed section 6(a)'s limitations on field and con-

---

[5] *California v. ARC America Corp*, 490 U.S. 93, 101 (1989) (quoting *Rice v Santa Fe Elevator Corp*, 331 U S 218, 230 (1947)) Conversely, in fields that implicate certain special and well-established Federal interests, such as the protection of Indian self-government, the test for determining whether State authority has been displaced is less exacting See, e.g., *California v Cabazon Band of Mission Indians*, 480 U.S 202, 215 (1987) (States, in the absence of congressional authorization, can regulate Indian conduct or Indian lands inside Indian country only in "exceptional circumstances"); *White Mountain Apache Tribe v. Bracker*, 448 U S 136, 143 (1980) ("The tradition of Indian sovereignty over the reservation and tribal members must inform the determination whether the exercise of state authority has been pre-empted by operation of federal law.").

[6] *See, e g.*, Jeffrey E. Shuren, *Legal Accountability For Utilization Review in ERISA Health Plans*, 77 N.C L Rev 731, 772 (1999) ("ERISA's preemption provisions combined with the limited remedies available under ERISA for breach of fiduciary duty have shielded [entities that perform utilization review] as well as third-party payers, from the consequences of [utilization review] decisions."); Jack K Kilcullen, *Groping for the Reins: ERISA, HMO Malpractice and Enterprise Liability*, 22 Am. J L & Med. 7, 9–10 (1996) (preemption under ERISA "interferes with judicial efforts to establish corporate liability" and prevents States from undertaking needed efforts to "reformulat[e] traditional concepts of medical malpractice to reach HMOs"); *see also Andrews-Clarke v Travelers Ins. Co.*, 984 F Supp 49, 63 (D. Mass 1997) ("Under any criterion .  the shield of near absolute immunity now provided by ERISA simply cannot be justified.").

flict preemption. Such difficult interpretive issues would introduce a form of confusion not present under current Supreme Court preemption doctrine.

Section 6(b)'s proposed changes to current regulatory preemption doctrine raise concerns similar to those raised by section 6(a)'s proposed changes to current statutory preemption doctrine. The Supreme Court has stated that "in proper circumstances, [a Federal] agency may determine that its authority is exclusive and pre-empt[ ] any state efforts to regulate in the forbidden area," *City of New York v. FCC*, 486 U.S. 57, 64 (1988). In describing these "proper circumstances," the Court has rejected the notion that the rulemaking agency must demonstrate that Congress specifically considered the question of regulatory preemption and decided to confer this authority on the rulemaking agency. Justice White, writing for a unanimous Court in *City of New York*, described the test of agency authority to preempt by regulation in the following terms:

> It has long been recognized that many of the responsibilities conferred on federal agencies involve a broad grant of authority to reconcile conflicting policies. Where this is true, the Court has cautioned that even in the area of pre-emption, if the agency's choice to pre-empt "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *United States v. Shimer*, 367 U.S. 374, 383 (1961).

*City of New York*, 486 U.S. at 64.

Section 6(b) would apparently alter the Supreme Court standard for determining whether rulemaking agencies possess the authority to issue preemptive regulations. Under this provision, a Federal rule issued after the effective date of the Federalism Accountability Act could not preempt State law unless (1) regulatory preemption was "authorized by the statute under which the rule is promulgated" and the regulation was accompanied by a statement in the Federal Register explicitly stating that such preemption was intended, or (2) the regulation directly conflicted with State law.

It is difficult to predict how courts might interpret the reference to statutory authorization in section 6(b)(1). Opponents of new regulations would likely argue that section 6(b)(1) is quite limited — that statutory authorization to issue preemptive regulations, in this context, can only mean specific and express authorization to issue such rules. (Rulemaking agencies would need some sort of statutory authorization to promulgate regulations that preempt by virtue of a direct conflict under section 6(b)(2); the omission of any reference to authorization in that provision might be cited as evidence that the authorization referred to in section 6(b)(1)

175

must be specific and explicit.) Moreover, opponents of new regulations would also be likely to argue that this restrictive reading of section 6(b)(1) must prevail so long as it is merely plausible, since ambiguities in the Act, would have to be resolved in favor of the States and the people by virtue of section 6(c).

These questions concerning the requirements for issuing preemptive regulations under section 6(b)(1) would, at a minimum, engender significant confusion and could produce a substantial volume of litigation. Uncertainty and the threat of litigation could be especially serious for agencies that are called upon to update and revise complex regulations under longstanding statutes that lack specific and express authorizations to issue preemptive rules. The Occupational Safety and Health Administration ("OSHA"), for example, could confront arguments that the Occupational Safety and Health Act, although construed in the past to authorize the issuance of preemptive regulations, lacks the required statutory statement and that new OSHA rules, therefore, can only preempt State law where the new OSHA requirement directly conflicts with State law.[7]

Under section 6(c), any ambiguity in S. 1214, or "in any other law of the United States" — predating or postdating the Federalism Accountability Act — would "be construed in favor of preserving the authority of the States and the people." The potential implications of an instruction of this sweeping scope are difficult to assess, although the potential for far reaching and unanticipated consequences is pervasive. It is unclear how this provision might affect the reach of Federal statutes and regulations. How would section 6(c) apply to statutory and regulatory language that, although ambiguous on its face, has been clarified by case law or administrative interpretation predating the enactment of section 6(c)? Would section 6(c) require adoption of the narrowest plausible reading of virtually every statutory or regulatory assertion of Federal power on grounds that such a reading operates to preserve the greatest authority for the States and the people? Special difficulties would arise in the interpretation of Federal laws that limit State authority in ways that arguably enhance the authority of the people. How, for example, would section 6(c) affect the operation of the Dormant Commerce Clause, which forbids States from imposing certain burdens on interstate commerce in areas where Congress has not acted affirmatively to authorize State activity? Would ambiguities concerning the scope of a Federal law authorizing State regulation be resolved in favor the authority of the States to regulate or the authority of the people to engage in interstate commerce in an environment free of State regulation? The breadth and generality of section 6(c) create a risk

---

[7] In *Gade v. National Solid Wastes Management Ass'n*, 505 U S. 88 (1992), eight members of the Court agreed that no express statutory provision invests OSHA regulations with the power to preempt "nonconflicting state laws" (that is, supplemental State-law requirements applicable to federally regulated practices). *Id* at 96–104 (plurality opinion of O'Connor, J.), *see id* at 117–18 (Souter, J., dissenting). Nevertheless, a majority concluded that OSHA regulations preempt such nonconflicting State laws, with the plurality basing preemption on the conflict between such State laws and Congress's clear intention to ensure that employees and employers are subject to "only one set of regulations." *Id* at 99, *see id* at 109 (Kennedy, J., concurring in the judgment under an express preemption rationale).

that unintentional ambiguities in Federal statutes and regulations, with tenuous connections to the balance between Federal and State power, could be exploited in unforeseen ways to frustrate the intentions of Congress and rulemaking agencies.

In short, section 6 of S. 1214, as drafted, would have far reaching effects. Sections 6(a) and 6(b) would significantly alter the rules under which courts determine the preemptive effects of Federal statutes and regulations. In our view, systematic reform of this nature would only be warranted if Congress were convinced that existing preemption doctrine systematically operates to frustrate congressional intent (and that statutory rules of construction would produce better results). If, on the other hand, Congress's concerns about current preemption doctrine derive from particular cases or classes of cases, any statutory reform should be tailored to correct the results in those cases or classes of cases. The potential implications of section 6(c) are considerably more pervasive. Section 6(c) has the potential to frustrate congressional intent and agency undertakings wherever questions arise as to the legal allocation of power between the Federal government and the States. It should be eliminated.

RANDOLPH D. MOSS
*Acting Assistant Attorney General*
*Office of Legal Counsel*